# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

ANDREW WARREN,                          )   Civil No. 05cv2095 LAB (NLS)
                                        )
                    Plaintiff,          )   **REPORT AND RECOMMENDATION**
                                        )   **FOR ORDER GRANTING IN PART**
v.                                      )   **AND DENYING IN PART**
                                        )   **DEFENDANT'S MOTION FOR**
WILLIAM KOLENDER, Sheriff; SAN          )   **SUMMARY JUDGMENT**
DIEGO COUNTY BOARD OF                   )
SUPERVISORS,                            )
                                        )   [Doc. No. 60]
                    Defendants.         )
_____  )

### BACKGROUND

Andrew Warren (Warren or Plaintiff), a California civil detainee proceeding pro se and in forma pauperis, filed this civil rights suit under 42 U.S.C. § 1983. Plaintiff alleges that under San Diego County Sheriff William B. Kolender (Defendant or Sheriff Kolender), the conditions of Plaintiff's confinement have violated his constitutional rights under the fourth, fourteenth and first amendments. Plaintiff filed a verified First Amended Complaint (FAC) with an accompanying declaration against several defendants. [Doc. No. 7.] The district court dismissed all defendants except for Kolender and the San Diego County Board of Supervisors. [Doc. No. 8.] In a subsequent order, the district court dismissed defendant San Diego County Board of Supervisors [Doc. No. 42.]

Plaintiff seeks compensatory and punitive damages and injunctive and declaratory relief. FAC at 6. The only remaining defendant, Sheriff Kolender, seeks summary judgment against Plaintiff on the grounds that there are no genuine issues of material fact to support Plaintiff's constitutional claims, and

1   that regardless of any violation, Defendant is entitled to qualified immunity or quasi-judicial immunity

2   as to certain claims.  The Court advised Plaintiff of his rights and obligations to oppose the motion

3   pursuant to *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988) and *Rand v. Rowland*, 154 F.3d 952 (9th

4   Cir. 1998). [Doc. No. 61.]  After receiving an extension of time, Plaintiff filed an opposition and lodged

5   a recent, unpublished case from the Eastern District of California.  The Court also considers Plaintiff's

6   FAC, signed under penalty of perjury, in opposition to the motion.[1]  Defendant filed a reply.

7          The Court took the matter under submission without oral argument.  For the following reasons,

8   this Court **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED in part**

9   and **DENIED in part**.

10                                  **RELEVANT FACTS**[2]

11  **Plaintiff's Convictions and Designation as an SVP.**

12         In 1999 Plaintiff was convicted of committing a lewd act on a child under the age of fourteen.

13  Warren Deposition, Def.'s Ex. 2 (Warren Depo.), 11:10-13.  He was sentenced to eight years in state

14  prison.  *Id.* at 11:14-16.  In 2000, Plaintiff plead guilty to a similar charge for conduct that occurred in

15  Rhode Island.  *Id.* at 12:12-21.  He  was scheduled to be released from Mule Creek State prison, where

16  he was serving his sentence, on February 21, 2005.  *Id.* at 11:17-23.  On January 4, 2005, however, the

17  Sheriff picked up Plaintiff and took him to the San Diego County jail for court proceedings to determine

18  whether he should be designated a Sexually Violent Predator (SVP).  *Id.* at 11:24-25, 13:13-25; FAC at

19  4.4.  The Sheriff housed Plaintiff for approximately the next twelve months, for the duration of the SVP

20  court proceedings.  Warren Declaration in Support of FAC (Warren Decl.) ¶ 3; FAC at 5.1.  On

21  December 13, 2005, a jury determined Plaintiff to be an SVP.  Warren Depo. 20:18-21.  On January 10,

22  2006, Plaintiff was transferred to Coalinga State Hospital according to the criminal court's order.

23  Warren Decl. ¶¶ 41-42; Warren Depo. 19:15-24, 20:21-24.

24  / / /

---

25         [1]Plaintiff is proceeding pro se.  Therefore, the Court considers as evidence any admissible
26  contentions stated in previous motions or pleadings that are based on personal knowledge and are
    verified under penalty of perjury as true and correct.  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004).
27
           [2]The factual allegations are taken from Plaintiff's FAC, declaration and deposition testimony.
28  Unless otherwise noted, Defendant does not present the Court with any evidence or factual allegations to
    contradict Plaintiff's alleged facts.

**George Bailey Unit 3A: January 4, 2005 to January 24, 2005.**

On January 4, 2005 Plaintiff was processed at the San Diego County Central Jail in downtown San Diego.  FAC at 5; Warren Decl. ¶¶ 5, 7-8 .  Later that day he was transferred to George Bailey and housed in protective custody in Unit 3A.  FAC at 5-5.1; Warren Decl. ¶ 11.  While at George Bailey Plaintiff was kept away from the general population of inmates.  FAC at 5-5.1.  All of his cell mates were criminal detainees going through criminal proceedings or awaiting transfer to a state prison.  FAC at 5.1; Warren Decl. ¶ 11.  Plaintiff was not harassed for his SVP status because the inmates at George Bailey did not know he was awaiting an SVP trial.  Warren Depo. 38:11-17.  While at George Bailey, though, Plaintiff was strip searched around four times, and at least two of those times were in front of female guards.  *Id.* at 25:2-26:8; Warren Decl. ¶ 13.  Plaintiff's cell was searched regularly.  Warren Depo. 23:22-24:6; Warren Decl. ¶ 12.

**San Diego Central Jail Unit 7D:  January 24, 2005 to May 24, 2005.**

From approximately January 24, 2005 through May 24, 2005, Plaintiff was housed in Unit 7D administrative segregation (ad seg) at the San Diego Central jail.  Warren Depo. 14:15-19, 17:5-7; Warren Decl. ¶ 15.  Ad seg inmates are separated from the general population of penal inmates.  Warren Depo. 14:18-21.  Plaintiff was housed in a two-man cell that was locked down 23 hours a day.  *Id.* at 14:22-23; 34:9-19.  When he was transferred there, Plaintiff had to wait three days for a shower.  Warren Decl. ¶ 15.  Though he was strip searched when he first arrived, Plaintiff was not strip searched during his four months in ad seg.  Warren Depo. 21:18-19; Warren Decl. ¶ 15.

Other inmates abused Plaintiff while he was housed in ad seg.  For example, Plaintiff's cell had a solid door with a window and a one-inch gap at the end of the door.  Warren Depo. 36:18-37:2.  "Gassing" is throwing human feces and urine on the cell windows and doors and into the cell.  *Id.* at 34:25-35:1; Elvin Declaration, Def.'s Ex. 5 (Elvin Decl.) ¶ 5.  An inmate named Guess "gassed" Plaintiff's cell with urine approximately three times during his stay in ad seg.  Warren Depo. 35:14-19, 37:9-17, 73:9-11.  In response to the gassing problem, the jail moved all inmates accused of gassing other inmates into one module.  Elvin Decl. ¶ 5.  When the guards removed inmate Guess from his cell, he resisted, and the guards pepper-sprayed him.  Warren Depo. 73:12-19.  The pepper spray went through the ventilation system and Plaintiff was subjected to the pepper spray intended for inmate

1  Guess.  *Id.* at 73:12-19; Warren Decl. ¶ 18.

2       Plaintiff also complains that one of the Sheriff deputies spurred inmates to further harass

3  Plaintiff.  Around April 2005, Deputy McCracken announced to all inmates–using the public address

4  system–that inmates with yellow bands were "jesters, cookie monsters, sex offenders" and "child

5  molesters."  Warren Depo. 38:20-39:19.  At the time of Deputy McCracken's announcement, and while

6  Plaintiff was housed in ad seg, he wore a yellow band.  *Id.* at 39:20-21.  The other inmates in ad seg

7  wore blue bands.  *Id.* at 39:22-24.  Because of this announcement Plaintiff suffered from sleep

8  deprivation and worried he would be assaulted by other inmates.  *Id.* at 41:12-42:13.  Inmates would

9  kick on Plaintiff's door through the night, leading to more anxiety and sleeplessness.  *Id.* at 42:14-21.

10       Finally, the florescent lights in Plaintiff's cell remained on twenty-four hours a day.  Warren

11  Depo. 43:23-44:18; Roland Declaration, Def.'s Ex. 6 (Roland Decl.), ¶ 4.  This was not the case,

12  however, for all inmates.  Warren Depo. 44:19-22.  Penal inmates awaiting sentencing or doing county

13  jail time–also known as "trustees" because they were not deemed escape risks–did not have 24-hour

14  lighting in their cells.  *Id.* at 44:23-45:15.  Plaintiff had to wrap his shirt around his eyes in order to

15  sleep.  *Id.* at 45:22-25.  He says, however, that covering his eyes did not help much, and that he would

16  always have bags under his eyes and was not as mentally sharp as he could have been.  *Id.* at 46:3-13.

17       During his time at the San Diego Central jail, Plaintiff complained about many of the conditions

18  of his confinement.  In addition to the gassing, public announcement and lighting issues, Plaintiff

19  complained that he could not sleep because inmates would watch television in the dayroom all the time,

20  he was not provided the means to clean and sanitize his living area on a regular basis, he did not have

21  telephone access during normal business hours to call his attorney, staff failed or refused to deliver

22  messages to attorneys to contact Plaintiff, and he did not have regular access to the dayroom or exercise

23  yard.  Warren Decl. ¶ 17.

24  **George Bailey Medical Unit: May 25, 2005 to January 10, 2006**

25       On May 25, 2005, Plaintiff and other civil detainees at the San Diego Central Jail were moved to

26  Medical Unit 101 (Medical 101) at George Bailey.  Warren Depo. 17:5-18:2, 49:8-11; Warren Decl. ¶¶

27  19-21.  They were kept separate from the criminal inmates.  Warren Depo. 60:10-13.  Medical 101 was

28  a dorm-style room with 16 beds in it.  Warren Decl. ¶ 21; Brewer Declaration, Def.'s Ex. 3 (Brewer

1   Decl.) ¶ 5; Warren Depo. 49:8-14.  Medical 101 provided a housing arrangement similar to the

2   arrangment Plaintiff currently has at Coalinga.  Warren Depo. 18:1-15.  Civil detainees in Medical 101

3   received more privileges than criminal inmates, including 24-hour access to phones and television, and

4   more dayroom, yard and law library access.  Ingrassia Declaration, Def.'s Ex. 8 (Ingrassia Decl.) ¶ 3;

5   Brewer Decl. ¶ 6.

6        When Plaintiff first moved to Medical 101, the unit was dirty and Plaintiff and other detainees

7   had to clean the area everyday.  Warren Depo. 18:16-19, 22:7-15, 49:15-50:13.  Plaintiff says they had

8   to clean the area with supplies from the same cleaning cart used by isolated inmates with communicable

9   diseases.  Warren Depo. 22:7-15, 49:21-23.  Plaintiff says he caught an unknown rash on his left arm

10  because he had to share the cleaning cart with the inmates infected with communicable diseases.  *Id.* at

11  33:19-34:1  Defendant, however, says that because the SVPs have more privileges than other inmates,

12  they have been assigned their own cleaning cart with cleaning supplies that they are allowed to have for

13  extended periods of time.  Brewer Decl. ¶ 10, p.6.

14       Plaintiff complains that the guards at George Bailey were worse than the ones downtown

15  because they "would do whatever they wanted to do."  Warren Depo. 50:14-23.  They deprived him of

16  sleep because they would consistently enter Medical 101, slam the entry door, hand out mail and change

17  the trash bags in the middle of the night.  Warren Decl. ¶¶ 27, 34.  Plaintiff says Deputy Barrera–who

18  he claims could not stand sex offenders–told the trustees at George Bailey that Plaintiff and the other

19  similarly-housed inmates were SVPs.  Warren Depo. 50:24-51:2; Warren Decl. ¶ 30.  The next day, the

20  trustees contaminated the SVPs' food with pubic hair.  Warren Depo. 51:2-6.  He says that another time,

21  Deputy Barrera brought other inmates to Medical 101, called out each detainee in Medical 101 and told

22  the other inmates that they were all SVPs, and that they could be identified by the black bands that they

23  were wearing.  *Id.* at 51:14-52:13.  As a result, when Plaintiff would go to court, he would be cuffed up,

24  shackled, put in the cage on the bus and inmates on the bus would verbally abuse him and spit on him.

25  *Id.* at 52:14-23.  Deputy Barrera says that she did not tell any other inmates about Plaintiff's civil

26  detainee status or the nature of his crimes.  Barrera Declaration, Def.'s Ex. 7 (Barrera Decl.) ¶ 4.  It is

27  common knowledge at George Bailey that "black banders" have been accused of sexual crimes, often

28  involving children.  Barrera Decl. ¶ 4; Roland Decl. ¶ 5.

Next, Plaintiff complains about his transportation between George Bailey and court.  Sometimes Plaintiff would get a ride in a van or personal car without any penal inmates.  Warren Depo. 57:12-15; 58:1-3.  But most of the time he would go on a bus with the penal inmates.  *Id.* at 57:15-16.  That would involve spending most of the day around the penal inmates in a holding cell, getting in an approximately four by three foot metal cage on the bus while in leg and waist shackles, and being subjected to the penal inmates who verbally abused him and spat on him.  *Id.* at 57:16-18, 58:14-59:13.

Plaintiff complains the law library at George Bailey was unconstitutionally inadequate and did not allow for meaningful access to the courts.  Warren Decl. ¶ 23.  He specifically complains about a book he ordered from the Georgetown Law Journal that he needed for a state tort action.  Warren Decl. ¶ 35.  Captain Ingrassia notified Plaintiff that he opened the journal, but sent it back because the size of the book violated the jail's policies on inmate mail.  Warren Depo. 74:5-75:23.  Ingrassia, however, said that he did not personally look through any of Plaintiff's mail.  Ingrassia Decl. ¶ 7.

Finally, Plaintiff complains about the $3 medical co-payment he had to pay for medical visits.  Warren Depo. 70:13-17; Warren Decl. ¶ 29.  Further, he says the medical staff was not "top par."  Warren Depo. 71:5-6.

**Religious Services.**

Plaintiff is Catholic.  Warren Depo. 66:23-24.  While at Mule Creek State Prison Plaintiff attended Catholic services every Sunday.  *Id.* at 66:25-67:3.  He attends Catholic services every Sunday at Coalinga.  *Id.* at 67:5-7.  While housed in the jail downtown, no church service was  available to Plaintiff.  *Id.* at 60:7-13.  Plaintiff filed a grievance, and he was referred to a Bible study, but after Plaintiff attended a few times the volunteer who ran the study did not return.  *Id.* at 71:12-72:5.

Plaintiff said he could attend only one religious service at George Bailey the entire time he was there.  Warren Depo. 66:14-18.  He said that Christian services were held out in the yard for the general population, but that he did not attend them.  *Id.* at 72:6-15.

**Plaintiff's Association with Others.**

Plaintiff complains he was only allowed to associate with the other civil detainees at George Bailey.  Warren Depo. 72:16-20.  In a hospital setting a detainee can roam around and talk on the phone without significant expense or monitoring.  *Id.* at 62:21-64:6.  In the jail setting someone monitored

1   phone calls, and Plaintiff could not mingle in a large group like the penal inmates could.  *Id.* at 62:21-

2   64:6; 65:13-18.  Plaintiff never requested to be housed in the general population at George Bailey.  *Id.* at

3   72:21-73:2.

4   **Plaintiff's Injuries.**

5          Plaintiff identifies one physical injury.  He caught a rash on his left arm.  Warren Depo. 33:22-

6   24.  The doctors still cannot identify what the rash is.  *Id.* at 33:24-34:1.

7          Plaintiff claims he suffered non-physical injuries.  He says the sleep deprivation caused him

8   intentional infliction of emotional distress.  Warren Decl. ¶¶ 27, 34.  While he did not suffer any

9   physical injuries from the strip searches, Plaintiff was humiliated, and the strip searches had the long-

10  lasting effect of having a fear and apprehension of authority.  Warren Depo. 28:14-29:5.

11         As for cell searches, Plaintiff says some of his legal work was read through and taken during

12  those searches.  Warren Depo. 30:14-25.  While Plaintiff did not suffer any other physical damage from

13  the searches, he felt frustrated and worried that he might not see some of his belongings again.  *Id.* at

14  31:5-16.  Those searches, however, did not make him to lose sleep or compel him to see a psychologist

15  or psychiatrist or take any medication.  *Id.* at 29:6-14.

16         Riding in the bus to and from George Bailey with the penal inmates did not cause Plaintiff any

17  physical injuries, but made him fear going to court with the penal inmates because he might get beat up.

18  Warren Depo. 59:14-23.  It did not raise any long-term issues such as depression, need for medication or

19  nightmares, nor did Plaintiff feel he needed to address the issue with a psychologist.  *Id.* at 59:24-60:9.

20         During all of 2005, Plaintiff never wanted to see a psychologist or a psychiatrist.  Warren Depo.

21  70:5-8.

22  **The Sexually Violent Predator Act.**[3]

23         An SVP is a person "convicted of a sexually violent offense against two or more victims for

24  which he or she received a determinate sentence and who has a diagnosed mental disorder that makes

25  the person a danger to the health and safety of others" and is "likely [to] engage in sexually violent

26  criminal behavior."  *Cal. Welf. & Inst. Code* § 6600(a).  Before a person completes a sentence for a

27

28         [3]This explanation of the SVP Act is largely based on the description in *Hydrick v. Hunter*, 500
    F.3d 978, 983 (9th Cir. 2007).

05cv2095 LAB (NLS)

1   predicate crime, the Departments of Corrections and Mental Health evaluate that person.  *See id.* § 6601.

2   If the two departments agree that the person might qualify as an SVP, the district attorney or county

3   counsel may file a petition for involuntary commitment.  *See id.* § 6601(i).  If a judge finds probable

4   cause to believe the person would likely reoffend upon release, the judge must order a trial to determine

5   whether the person is an SVP.  *Id.* at § 6602(a).  That person shall remain in custody in a "secure

6   facility" until the trial is over.  *Id.*  If a jury finds someone to be an SVP, that person is civilly committed

7   for an indefinite period to commence *after* his criminal sentence is fulfilled.  *Id.* at §§ 6602-6604.

8        The SVP Act does not define "secure facility."  *Munoz v. Kolender*, 208 F. Supp. 2d 1125, 1137

9   n.9 (S.D. Cal. 2002) (Burns, J.)  But this district determined that in 2002, local law enforcement

10   detention facilities, i.e. the county jails, were appropriate facilities to house potential SVPs awaiting

11   trial.  *Id.* at 1143-44.  Housing potential SVPs in county jail while awaiting trial did "not run afoul of

12   any constitutional right."  *Id.* at 1144.

13        On December 27, 2004, the Ninth Circuit Court of Appeals modified the rule that persons

14   awaiting SVP trials could be housed in county jails.  The court found that a person awaiting an SVP trial

15   "is entitled to protections at least as great as those afforded to a civilly committed individual and at least

16   as great as those afforded to an individual accused but not convicted of a crime."  *Jones v. Blanas*, 393

17   F.3d 918, 932 (9th Cir. 2004).

18        After the *Jones* decision, the County moved all SVPs and civil detainees to the George Bailey

19   Detention Facility.  Ingrassia Decl. ¶¶ 3-6; Brewer Decl. ¶¶ 3-4.  Instead of being housed in cells, they

20   were housed together in Medical 101, a dorm separate from the general population.  Ingrassia Decl. ¶ 6;

21   Brewer Decl. ¶¶ 4-5.  They received more privileges than the criminal detainees, such as more access to

22   television, phones, dayroom and the law library.  Brewer Decl. ¶ 6.

23                              **LEGAL STANDARDS**

24   **Summary Judgment.**

25        Summary judgment is appropriate when there is no genuine issue as to any material fact, and the

26   moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c); *Celotex Corp. v.*

27   *Catrett*, 477 U.S. 317, 322 (1986).  A fact is "material" when, under the governing substantive law, it

28   could affect the outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

1    dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a

2    verdict for the nonmoving party." *Id.* at 248.

3        A party seeking summary judgment bears the initial burden to establish an absence of a genuine

4    issue of material fact. *Celotex*, 477 U.S. at 323. The moving party can satisfy this burden by (1)

5    presenting evidence that negates an essential element of the non-moving party's case; or (2)

6    demonstrating that the nonmoving party failed to establish an essential element of that party's case for

7    which that party bears the burden of proof. *Id.* at 322-23. This burden requires the moving party to

8    identify the pleadings, depositions, affidavits or other evidence that the party "believes demonstrates the

9    absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.

10       If the moving party meets this burden, the non-moving party cannot defeat summary judgment

11    by merely demonstrating "there is some metaphysical doubt as to the material facts." *Scott v. Harris*,

12    550 U.S. __, 127 S. Ct. 1769, 1776 (2007) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio*

13    *Corp.*, 475 U.S. 574, 586 (1986)). Rather, the non-moving party must "go beyond the pleadings and by

14    her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate

15    'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R.

16    Civ. P. 56(e)). When determining summary judgment, the court must view the underlying facts in the

17    light most favorable to the party opposing the motion. *See Matsushita*, 475 U.S. at 587.

18    **42 U.S.C. § 1983.**

19       "[Section] 1983 'is not itself a source of substantive rights,' but merely provides 'a method for

20    vindicating federal rights elsewhere conferred.'" *Graham v. Connor,* 490 U.S. 386, 393-94 (1989)

21    (quotation omitted). A section 1983 claim must allege: (1) a violation of rights protected by the

22    Constitution or created by federal statute, (2) proximately caused (3) by conduct of a 'person' (4) acting

23    under color of state law." *Crumpton v. Gates,* 947 F.2d 1418, 1420 (9th Cir. 1991). To prevail, a

24    claimant must prove that: (1) a person acting under color of state law committed the conduct at issue,

25    and (2) the conduct deprived the claimant of some right, privilege, or immunity protected by the

26    Constitution or laws of the United States. 42 U.S.C. § 1983; *Parratt v. Taylor*, 451 U.S. 527, 535

27    (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 328 (1986); *Haygood v.*

28    *Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985) (en banc).

<u>**D**ISCUSSION</u>

**I.**     **<u>Sheriff Kolender's Liability.</u>**

**A.**     **<u>Individual Liability.</u>**

To hold a person "liable under section 1983 there must be a showing of personal participation in the alleged rights deprivation." *Id.*  A supervisory official may be liable only if he or she was personally involved in the constitutional deprivation, or if there was a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation.  *See Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).  "The inquiry into causation must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988).  Causation may be established by showing that the supervisor set in motion a series of acts by others that the supervisor knew or reasonably should have known would cause others to inflict the injury.  *Watkins v. City of Oakland*, 145 F.3d 1087, 1093 (9th Cir. 1998).

Plaintiff sued Sheriff Kolender in his personal capacity.  FAC at 3 ¶ 1.  Sheriff Kolender argues that Plaintiff has not offered any evidence that he was personally responsible for any of the acts or omissions occurring during Plaintiff's custody in the county jails.  Plaintiff, however, alleges that Sheriff Kolender is the policy maker for the San Diego County jail system, and that as a result of his policies, his constitutional rights were violated.  FAC at 5-5.1 ¶ 1.  In his deposition, Plaintiff said that Sheriff Kolender "was given the Internal Affairs report that I sent a long time ago, and he neglected to do anything about it. . . . I know that he has written policies and stuff regarding the changes already.  So he is involved in overall changes and personal ongoing stuff."  Warren Depo. 56:1-9.

As the moving party, Sheriff Kolender has the initial burden of demonstrating the absence of a genuine issue of material fact, not the Plaintiff.  Sheriff Kolender does not dispute that he implemented the policies at issue in this case.  Accordingly, the Court finds there is a triable issue of material fact as to Sheriff Kolender's personal liability and **RECOMMENDS** that the motion for summary judgment be **DENIED** on this ground.

/ / /

/ / /

**B.    Liability Under Official Capacity.**

Plaintiff also sued Sheriff Kolender in his professional capacity.  FAC at 3 ¶ 1.  To defend against Defendant's summary judgment motion on this issue, Plaintiff must present evidence sufficient to show that a genuine issue of material fact exists as to Sheriff Kolender's (1) participation in or directing the constitutional violation; (2) knowledge of the violation and failure to act to prevent it; (3) failure to train or supervise personnel, leading to the deprivation of constitutional rights; or (4) adoption of a policy that led to the deprivation of constitutional rights.  *Ybarra v. Reno Thunderbird Mobile Home Village*, 723 F.2d 675, 680-681 (9th Cir. 1984).  Because this Court has already recommended finding that there is a genuine issue of material fact as to whether the policies Sheriff Kolender created violated Plaintiff's constitutional rights, it **RECOMMENDS** that the summary judgment motion be **DENIED** with respect to Sheriff Kolender's professional capacity liability.

**C.    Respondeat Superior.**

Plaintiff complains about potential policy violations by deputies McCracken and Barrera.  Respondeat superior liability does not exist under section 1983.  *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002) (citation omitted).  Sheriff Kolender can only be liable for those alleged violations if he personally participated in them or, by his conduct, caused the violation.  *Id.*; *See Redman v. County of San Diego*, 942 F.2d 1435, 1446 (9th Cir. 1991) (en banc).  As explained above, Plaintiff asserts Sheriff Kolender is the policy maker for the jails.  Defendant says that in 2005 deputies were "encouraged" to not identify civil detainees, such as SVPs, to general population inmates.  Roland Decl. ¶ 5.  Sheriff Kolender never offers any evidence, however, showing or specifically stating the policy concerning the identification of SVPs.  The fact that deputies were "encouraged" to not identify the civil detainees is not a sufficient statement or explanation of the relevant policy.  Therefore, this Court **RECOMMENDS** that summary judgment for Sheriff Kolender on the basis of respondeat superior liability be **DENIED**.

**VI.    Immunity.**

**A.    Qualified Immunity.**

Sheriff Kolender argues that he should be shielded from personal liability under qualified immunity for his decision to house Plaintiff in the County jail from January 4 to May 25, 2005.  He says that at the time Plaintiff was transferred to Sheriff Kolender's custody on January 4, 2005, there was no

1  clear law providing that Plaintiff could not be detained in county jail.  Sheriff Kolender says that up

2  until that time he had been relying on *Munoz v. Kolender*, 208 F. Supp. 2d 1125 (S.D. Cal. 2002), which

3  had been the controlling case on housing civil detainees, and which allowed them to be housed in the

4  county jail.  Sheriff Kolender says that once the Sheriff's Department analyzed *Jones*, it changed its

5  policy on housing SVPs in jail and moved them to a dorm area at George Bailey.

6       State officials are protected from "liability for civil damages insofar as their conduct does not

7  violate clearly established statutory or constitutional rights of which a reasonable person would have

8  known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The inquiry has two parts: (1) "whether the

9  law governing the official's conduct was clearly established;" and (2) whether "under that law, a

10 reasonable official would have believed the conduct was lawful."  *Somers v. Thurman*, 109 F.3d 614,

11 617 (9th Cir. 1997); *Saucier v. Katz*, 533 U.S. 194, 199 (2001).  This standard "gives ample room for

12 mistaken judgments by protecting all but the plainly incompetent or those who knowingly violate the

13 law."  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (internal citation and quotations omitted); *Jeffers v.*

14 *Gomez*, 267 F.3d 895, 910 (9th Cir. 2001).  "To defeat qualified immunity, 'the right allegedly violated

15 must be defined at an appropriate level of specificity before a court can determine if it was clearly

16 established.'" *Hydrick v. Hunter,* 500 F.3d 978, 989 (9th Cir. 2007), pet'n for cert. filed Jan. 17, 2008.

17      Sheriff Kolender admits that in early 2005 his legal advisor contacted the Captain of the

18 Detention Services Bureau and informed him that "because of a new court ruling, all sexually violent

19 predators being held in San Diego County jail as civil detainees needed to be moved to a different

20 location, kept separate from general population inmates, and given more privileges than criminal (penal)

21 inmates."  Ingrassia Decl. ¶ 3.  This Court finds that the Ninth Circuit's decision in *Jones* was clearly

22 established law and that Sheriff Kolender–by contacting the Captain of the Detention Services Bureau in

23 early 2005–recognized it was clearly established law in early 2005.  The next inquiry, then, is whether

24 Sheriff Kolender believed that under that law it was lawful for him to house Plaintiff in San Diego

25 County Central Jail from January 4 to May 24, 2005.

26      In early 2005 Sheriff Kolender knew Plaintiff could no longer be housed in County jail.  Yet

27 Plaintiff stayed there for four months, beginning one month after the *Jones* case came out.  This Court

28 finds that by housing Plaintiff in jail for those four months, while cognizant of the Ninth Circuit's

1   ruling, he knowingly violated the law.  Therefore, this Court **RECOMMENDS** that Defendant's claim

2   for qualified immunity for housing Plaintiff in the County jail be **DENIED**.

3           **B.      Quasi-Judicial Immunity.**

4           Sheriff Kolender argues that he is entitled to absolute quasi-judicial immunity because he took

5   custody of Plaintiff pursuant to a court order.  Absolute judicial immunity extends not only to judges,

6   but to nonjudicial officers for "all claims relating to the exercise of judicial functions."  *Burns v. Reed*,

7   500 U.S. 478, 499 (1991) (Scalia, J., concurring in part and dissenting in part).  State officials

8   performing the duties of advocate or judge may enjoy quasi-judicial immunity for certain functions but

9   not for all functions of their job.  *Swift v. California*, 384 F.3d 1184, 1188 (9th Cir. 2004) (quotations and

10  citation omitted); *see Coverdell v. Department of Social & Health Services*, 834 F.2d 758 (9th Cir. 1987)

11  (finding social worker entitled to quasi-judicial immunity for removing plaintiff's baby from the

12  hospital because her actions were within the scope of her statutory authority as a quasi-prosecutor in a

13  child dependency proceeding).  "For example, a state prosecutor is entitled to absolute immunity when

14  engaged 'in activities intimately associated with the judicial phase of the criminal process,' but is only

15  entitled to qualified immunity when 'performing investigatory or administrative functions, or [when]

16  essentially functioning as a police officer or detective.'  *Swift*, 384 F.3d at 1188 (quotations and citations

17  omitted).

18          Here, Sheriff Kolender does not show how, by obeying the court order to receive and house

19  Plaintiff, he was acting in a quasi-judicial role as opposed to an administrative function.  By simply

20  housing Plaintiff, Sheriff Kolender has not met his burden to show that he was intimately involved with

21  Plaintiff's criminal process or that he was otherwise acting in a quasi-prosecutorial or quasi-judicial

22  role.  Therefore, this Court **RECOMMENDS** that Sheriff Kolender's motion for summary judgment on

23  the basis of quasi-judicial immunity be **DENIED**.

24  **III.    Fourth Amendment Claims.**

25          Plaintiff alleges that the implementation of Sheriff Kolender's policies effectively violated his

26  fourth amendment right to be free from unreasonable searches and seizures.  He says he was strip

27  searched around four times–at least twice in front of female guards–at George Bailey between January 4

28  and January 24, 2005.  He also complains his cell was unlawfully searched during this time.  Plaintiff

1  also complains he was strip searched once when he was processed at the San Diego County Jail on

2  January 24, 2005 and admitted to ad seg.

3      The right to be free from unreasonable searches and seizures extends to SVPs. *Hydrick*, 500

4  F.3d at 993.  Like pretrial detainees, the constitutional rights of SVPs may be limited in the interest of

5  institutional security and order. *Bacon v. Kolender*, 2007 U.S. Dist. LEXIS 66274, *14-*15 (S.D. Cal.

6  2007).  To balance the detainee's privacy right and right to be free from unreasonable searches against

7  the institution's security and penological needs, the Court must consider these factors: (1) scope of the

8  intrusion; (2) way in which the detainee was searched; (3) justification for the search; and (4) where the

9  search occurred. *Id.* at *15.

10      Defendant explains that in general, strip searches of inmates at George Bailey are completed

11  pursuant to jail policy and are vital in maintaining the safety of inmates, staff, and visitors.  Brewer

12  Decl. ¶ 8, pp.2-3.  Further, female guards are not allowed to conduct strip searches of male inmates at

13  George Bailey and every attempt is made to prevent a female guard from having to be present.  Brewer

14  Decl. ¶ 8, p.4.  By May 2005, George Bailey changed its policy and stopped strip searching SVPs unless

15  there was reasonable suspicion that the inmate possessed contraband.  Brewer Decl. ¶ 8, p.5.  Defendant

16  also explains that searches of an inmate's cell are also vital in maintaining the safety of inmates, staff,

17  and visitors.  *Id.*

18      But the only fourth amendment violations Plaintiff complains about allegedly occurred from

19  January 4 to January 24, 2005.  Sheriff Kolender argues that Plaintiff was still a prisoner serving a

20  criminal sentence at that time, as his earliest possible release date from prison was February 21, 2005.

21  But Sheriff Kolender provides no evidence that Plaintiff was a criminal inmate until February 21, 2005.

22  And, Plaintiff alleges that on January 4, 2005, he "ceased being a prisoner and was a Civil Detainee for

23  the purpose of establishing his Legal Status."  FAC at 4.4.  He says that during that time he was

24  technically on parole from the Department of Corrections.  *Id.*  This Court recommends finding there is

25  a triable issue of material fact as to Plaintiff's status during the time period from January 4, 2005 to

26  February 21, 2005.  The determination of Plaintiff's status will impact the analysis of whether there was

27  any fourth amendment violation during that time.  Because that material fact has not been resolved, this

28  Court **RECOMMENDS** that Defendant's motion for summary judgment on the fourth amendment

1  claim be **DENIED**.

2  **IV.    Fourteenth Amendment Claims.**

3          Plaintiff claims that Sheriff Kolender violated his substantive due process rights through

4  implementation of policies that caused these acts:  (1) failure to protect Plaintiff from the abuse of other

5  detainees and employees; (2) use of excessive force when transporting Plaintiff on the bus to and from

6  court; (3) failure to provide constitutionally adequate conditions of detention; and (4) failure to provide

7  adequate medical care.

8          The California Legislature has noted that "persons eligible for commitment and treatment as

9  SVP's are to be viewed not as criminals but as sick persons."  *Jones*, 393 F.3d at 933 (internal

10  quotations and citations omitted).  For SVPs, due process requires that "the conditions and duration of

11  confinement under the Act bear some reasonable relation to the purpose for which persons are

12  committed."  *Seling v. Young*, 531 U.S. 250, 265 (2001) (citations omitted).  As to the fourteenth

13  amendment claim of a person awaiting an SVP determination, "a presumption of punitive conditions

14  arises where the individual is detained under conditions identical to, similar to, or more restrictive than

15  those under which pretrial criminal detainees are held, or where the individual is detained under

16  conditions more restrictive than those he or she would face upon commitment."  *Jones*, 393 F.3d at 934.

17  To rebut this presumption, defendants must explain how a legitimate, non-punitive purpose justified the

18  conditions of the detention.  *Id.*  Legitimate, non-punitive government interests include ensuring a

19  detainee's presence at trial, maintaining jail security and effective management of a detention facility.

20  *Id.* at 932.

21          **A.    Failure to Protect.**

22          Plaintiff claims that Defendant's policies did not protect him from criminal inmates.  He says he

23  was intentionally exposed to other inmates' urine in his housing arrangement.  Plaintiff also says that he

24  was expressly targeted for abuse because on at least two occasions, sheriff deputies announced that

25  Plaintiff was a sex offender, and the criminal inmates contaminated his food with pubic hair and spit on

26  and harassed him when he rode among them on the bus to court.  Plaintiff says that due to these issues

27  he suffered sleep deprivation, intentional infliction of emotional distress, fear and apprehension of

28  authority.

1    Plaintiff's right to be protected and confined in a safe institution is clearly established. *Hydrick,*

2  500 F.3d at 996-997. As to Plaintiff's allegations, first, Defendant does not dispute that Plaintiff was

3  exposed approximately three times to another inmate's urine through "gassing." In response to that

4  issue, deputies moved the problem inmate to another cell, which seemed to address the gassing problem.

5  While Defendant apparently acted to remedy the situation, a question of fact remains as to what was the

6  relevant policy that allowed Plaintiff to be exposed to inmates who would "gas" him, how long he was

7  exposed to the gassing, how quickly Defendant responded to it, and whether Plaintiff's exposure to the

8  gassing served a legitimate non-punitive purpose and justified his detention within that population.

9    Second, Plaintiff complains that sheriff deputies at both the San Diego County Jail and George

10  Bailey announced to criminal inmates that Plaintiff was an SVP, which subjected him to abuse and

11  harassment. Defendant never expressly identifies the relevant policy regarding identifying civil

12  detainees as SVPs. Sheriff Kolender only offers evidence in the form of a declaration by Sergeant

13  Roland, who was the Detentions Sergeant at San Diego Central Jail in 2005. He says that "[d]uring

14  2005 deputies were encouraged not to identify civil detainees such as SVPs to general population

15  inmates, because this could lead to violence towards the civil detainees and SVPs." Roland Decl. ¶ 5.

16  The Sergeant went on to say that the crime associated with each colored arm band is considered

17  common knowledge among inmates and that inmates are often able to deduce or learn the status of

18  SVPs. Roland Decl. ¶ 5.

19    Through this declaration Sheriff Kolender never expressly explains what his policy was

20  concerning the announcement to criminal inmates, nor does he attempt to explain the legitimate, non-

21  punitive purpose of using the colored arm bands to identify different types of prisoners. This Court

22  finds, therefore, that there is a genuine issue of material fact as to Defendant's failure to protect Plaintiff

23  from criminal inmates, and **RECOMMENDS** that the motion for summary judgment be **DENIED** for

24  this claim.

25    **B.    Excessive Force.**

26    Plaintiff complains that Sheriff Kolender's policies caused sheriff deputies to use excessive force

27  on Plaintiff when transporting him with criminal inmates to court. He says on days he was to go to

28  court, he would spend most of the day in a holding cell, then be bound by leg and waist shackles as he

1   was placed in a four by three foot metal cage on the bus with criminal inmates.

2        Plaintiff has a well-established right to be free from use of excessive force. *Hydrick*, 500 F.3d at

3   997.  While excessive force claims for civil detainees constitute fourteenth amendment due process

4   claims, because they are typically reviewed under the eighth amendment in prisoner cases–and SVPs

5   must be afforded at least the same rights afforded to criminal inmates–eighth amendment jurisprudence

6   provides some guidance as to what constitutes use of excessive force. *Id.* at 998.  Those considerations

7   account for "the need for the application of force, the relationship between the need and the amount of

8   force used, the threat perceived by the officer, any effort to temper the severity of the forceful response,

9   and the extent of the injury inflicted and whether the force was applied for a legitimate purpose." *Id.*

10  (citing *Hudson v. McMillian*, 503 U.S. 1, 7 (1992)).

11       Here, when traveling to or from court, Plaintiff was placed in a passenger van or bus, depending

12  on how many prisoners needed to be transported.  Billick Declaration, Def.'s Ex. 9 (Billick Decl.) ¶ 7.

13  The vehicles have seats near the front that are separated from the rest of the seats by a steal partition

14  with diamond-shaped openings approximately one inch in diameter. *Id.* at ¶ 7.  Civil detainees are

15  placed in the front, segregated area. *Id.* at ¶ 7.  Sheriff Kolender's transportation unit operates on a very

16  limited budget and is short-staffed, so it is not practical or cost-effective to use separate transportation

17  only for civil detainees. *Id.* at ¶ 9.  Deputies load and unload prisoners so as to minimize the chances of

18  any contact between criminal and civil detainees. *Id.* at ¶ 10.  At all times the deputies try to maintain

19  the security and safety of the civil detainees, criminal inmates and detentions staff. *Id.* at ¶ 8.  Also, due

20  to complaints by civil detainees about being spit on, sheets of plexiglass have been attached to the steel

21  partitions to prevent the criminal inmates from spitting on the civil detainees. *Id.* at ¶ 11.

22       While this Court finds that Defendant has successfully rebutted Plaintiff's complaint about not

23  having separate transportation for civil detainees only, it cannot recommend finding summary judgment

24  in Defendant's favor on this issue.  First, Defendant admits that the original transportation practices

25  placed Plaintiff close enough to criminal detainees–and without adequate protection–so that criminal

26  inmates could spit on him. *See Bacon*, 2007 U.S. Dist. LEXIS 66274 at *34-*35 (allowing criminal

27  inmates to get close enough to civil detainees so that they could spit on them while being transported

28  could violate right to personal security).  Second, Defendant has presented no evidence to justify why he

1   kept Plaintiff cuffed up and shackled for most of the day while being transported to and from Court.

2   While there might be a legitimate purpose for keeping Plaintiff in leg and waist shackles and in a

3   holding cell for most of the day when needing to transport him, Defendant has not attempted to explain

4   the need for use of that force, the potential threat to officers or an effort to temper the severity of that

5   force.  Accordingly, this Court **RECOMMENDS** that Defendant's motion for summary judgment based

6   on use of excessive force be **DENIED**.

7           **C.     Conditions of Confinement.**

8           Plaintiff complains that the conditions of his confinement were constitutionally inadequate.  At

9   the San Diego County Central Jail, Plaintiff complains he was on lockdown 23 hours in ad seg while the

10  criminal inmates were allowed more time out of their cells.  He says he was punished like a criminal

11  inmate while there because he could not clean and sanitize his living area regularly, he could not call his

12  attorney during business hours and did not have regular access to the dayroom or exercise yard.

13  Plaintiff also says he endured florescent lighting for 24 hours a day, which impaired his sleeping ability.

14  While in Medical 101 at George Bailey, Plaintiff complained the conditions were unsanitary and posed a

15  health risk, and caused him to suffer a rash on his left arm that doctors are still unable to identify.

16                  ***1.      Twenty-Three Hour Lockdown.***

17          A court may presume punitive conditions where a civil detainee is detained in conditions

18  "identical to, similar to, or more restrictive than those under which pretrial criminal detainees are held."

19  *Jones*, 393 F.3d at 934.  Defendant argues that Plaintiff's time in ad seg was not punitive because,

20  according to policy, he was being held separate from the general population of criminal inmates.  Rose

21  Declaration, Def.'s Ex. 4 (Rose Decl.) ¶ 9; Elvin Decl. ¶ 6.  He explains that while the deputies "tried to

22  give inmates as much time in the day room as possible. . . this was more difficult for the civil detainees

23  and SVPs in Administrative Segregation, because they could not be present in the day room with other

24  inmates."  Elvin Decl. ¶ 6.  This practice was not intended to punish, but rather was the result of limited

25  space in which to house SVPs and a limited number of deputies.  *Id.*

26          As the *Jones* court found, Defendant's assertions that Plaintiff's time in ad seg was not punitive

27  lies in contrast to the restrictions Plaintiff lived with while in ad seg.  Plaintiff's significant or total

28  limitations on access to cleaning products, telephone privileges, dayroom access or time in the exercise

18

1   yard and 23-hour lockdown everyday indicate Plaintiff was more restricted in ad seg than criminal

2   inmates were in the general population.  *See Jones*, 393 F.3d at 934.  Aside from saying he was short-

3   staffed on deputies, Defendant has not explained any other legitimate, non-punitive justifications for

4   Plaintiff's conditions of confinement.  While the Court appreciates Sheriff Kolender may work with

5   limited resources, that, on its own, is not enough to justify Plaintiff's conditions here as compared to the

6   criminal inmates.  "If the criminal population can be safely housed without the restrictions of [ad seg], it

7   is difficult to see why SVPA detainees could not be so housed as well."  *Id.* at 935.

8                    **2.      *Twenty-Four Hour Florescent Lighting.***

9            Constant illumination, if objectively and sufficiently serious, *can* violate an inmate's eighth

10   amendment rights when there is no legitimate penological justification for the continuous lighting.

11   *Keenan v. Hall*, 83 F.3d 1083, 1090-91 (9th Cir. 1996); *see also Zatko v. Rowland*, 835 F.Supp. 1174,

12   1181 (N.D. Cal. 1993) (constant illumination of cell with bright light violates inmate's basic right to

13   shelter).  While Plaintiff's claim for constant illumination is analyzed as a fourteenth amendment due

14   process claim, eighth amendment case law provides the baseline for analyzing the constitutionality of

15   the condition.  *Hydrick*, 500 F.3d at 998.

16            Defendant acknowledges the florescent night lights in each inmate's cell are kept on 24 hours a

17   day.  Roland Decl. ¶4.  He explains, though, that this policy is not intended to punish the inmates, but to

18   ensure jail security.  *Id.*  Enforcement of this policy has decreased the number of crimes and illegal

19   activities that occur in the jail.  *Id.*

20            While Defendant has explained a legitimate, non-punitive purpose for the lighting policy, he still

21   has not explained why, in particular, he subjected Plaintiff to this policy.  Plaintiff says that trustees

22   (penal inmates awaiting sentencing or those not deemed escape risks) did not have 24-hour lighting in

23   their cells.  Defendant has not met his burden to explain why Plaintiff, as a civil detainee, was subject to

24   the same lighting conditions as criminal inmates who were deemed escape risks or were otherwise prone

25   to committing further criminal acts in jail.

26                    **3.      *Unsanitary Conditions at Medical 101.***

27            Plaintiff complains about the sanitary conditions at Medical 101 because he had to clean the area

28   with the same cleaning cart and supplies that were used by inmates with communicable diseases.  He

1    says that as a result, he suffered from a rash that his doctors could not diagnose.

2        Plaintiff has a clearly established right not to be exposed to unsanitary conditions.  *Hydrick*, 500

3    F.3d at 997.  Defendant says that Plaintiff did not receive a cleaning cart that had just been used by

4    inmates with communicable diseases, because the jail ensures that inmates with communicable diseases

5    do not use the same cleaning carts as other inmates.  Brewer Decl. ¶ 10, p.6.  He explains that because

6    civil detainees and SVPs are allowed more privileges than other inmates, they have been assigned their

7    own cleaning cart and supplies that they are allowed to keep for extended periods of time.  *Id.*

8        This Court finds Defendant's explanation of the relevant policy sufficient to rebut Plaintiff's

9    asserted fact as to the use of cleaning carts in Medical 101.  First, the policy allows for the separately-

10   housed SVPs to hold on to their own cleaning carts and to clean their own living space.  Second,

11   Plaintiff has never connected his still-undiagnosed rash with exposure to a communicable disease from

12   the cleaning cart he used upon his arrival at Medical 101.  Therefore, no genuine issue of material fact

13   remains as to the sanitary conditions at Medical 101.

14       For the reasons explained above, the Court **RECOMMENDS** that Defendant's motion for

15   summary judgment be **DENIED** as to Plaintiff's complaints regarding the conditions of his confinement

16   while in ad seg at the San Diego County Jail, and **GRANTED** as to Plaintiff's claim for unsanitary

17   conditions while at Medical 101.

18       **D.    Medical Care.**

19       Plaintiff complains that he had to pay a $3 medical co-payment and that the medical staff was

20   not "top par."  Claims that allege a failure to provide medical care for civil detainees are analyzed as a

21   fourteenth amendment due process claim.  *Bacon*, 2007 U.S. Dist. LEXIS 66274 at *20-*21 (citing *Bell*

22   *v. Wolfish*, 441 U.S. 520, 535 n.16 (1979); *Gibson v. County of Washoe*, 290 F.3d 1175, 1187 (9th Cir.

23   2002)).  Like the other due process claims for civil detainees that borrow from eighth amendment

24   jurisprudence, the Court will refer to eighth amendment standards to analyze Plaintiff's medical care

25   claims.  *Bacon*, 2007 U.S. Dist. LEXIS 66274 at *21.

26       Prison officials violate a prisoner's eighth amendment right to be free from cruel and unusual

27   punishment if they are deliberately indifferent to the prisoner's serious medical needs.  *Estelle v.*

28   *Gamble*, 429 U.S. 97, 106 (1979); *Hunt v. Dental Dep't*, 865 F.2d 198, 200 (9th Cir. 1989).  "In order to

1  show deliberate indifference, an inmate must allege sufficient facts to indicate that prison officials acted

2  with a culpable state of mind." *Wilson v. Seiter*, 501 U.S. 294, 302 (1991). The indifference to medical

3  needs must also be substantial; inadequate treatment due to malpractice, or even gross negligence, does

4  not amount to a constitutional violation. *Estelle*, 429 U.S. at 106. The court must focus on the

5  seriousness of the prisoner's medical needs and the nature of the defendants' response to those needs.

6  *See McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), overrruled on other grounds by *WMX*

7  *Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). Differences in judgment between an

8  inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not

9  enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).

10        A "serious" medical need exists if the failure to treat a prisoner's condition could result in

11  further significant injury or the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104.

12  Thus, the "existence of an injury that a reasonable doctor or patient would find important and worthy of

13  comment or treatment; the presence of a medical condition that significantly affects an individual's daily

14  activities; or the existence of chronic and substantial pain are examples of indications that a prisoner has

15  a 'serious' need for medical treatment." *McGuckin*, 974 F.2d at 1059-60; *Lopez v. Smith*, 203 F.3d

16  1122, 1131-32 (9th Cir. 2000).

17        Here, Plaintiff provides little information regarding his medical claim. He only complains about

18  the $3 co-payment and quality of the medical staff. He says he suffers from a rash that has still gone

19  undiagnosed. But other than the rash–from which Plaintiff does not allege any pain and says that only a

20  little of it remains–Plaintiff does not claim any other physical injuries. Further, he never says he was

21  denied medical treatment.

22        This Court finds that Defendant has met his burden to point to an absence of a genuine issue of

23  material fact as to the medical claim. First, Plaintiff's rash does not arise to a serious medical condition,

24  as it does not significantly affect Plaintiff's daily activities or cause chronic and substantial pain.

25  Second, while the medical staff may not be "top par," there is no indication the staff acted with a

26  culpable state of mind or that they were even grossly negligent. Finally, Plaintiff was never denied

27  treatment. While at the time Plaintiff sought treatment SVPs were charged the state-law required $3 co-

28  pay for each visit, those seeking medical help were not denied treatment, even if they lacked the funds.

1   Didier Declaration, Def.'s Ex. 10 (Didier Decl.) ¶¶ 3-4.  Further, Defendant has since changed the

2   policy so that no SVPs are charged a medical co-payment.  *Id.* at ¶ 5.

3          Therefore, there is no genuine issue of material fact in dispute which, if proven, would support

4   finding that the jails' medical staff knew or could infer that Plaintiff suffered from a serious medical

5   condition or that they had otherwise denied him necessary treatment.  Accordingly, this Court

6   **RECOMMENDS** that Defendant's motion for summary judgment on the medical claim be

7   **GRANTED**.

8          **E.     Access to Courts Claim.**

9          Plaintiff claims the law library at George Bailey was unconstitutionally inadequate and did not

10  allow for meaningful access to the courts.  Specifically, he complains that he ordered a book from the

11  Georgetown Law Journal, which he needed for a state court action, but that Captain Ingrassia returned

12  the book to the sender before Plaintiff saw it.

13         Prisoners have a constitutional right of access to the courts under the first and fourteenth

14  Amendments. *See Lewis v. Casey,* 518 U.S. 343, 346 (1996); *Vandelft v. Moses,* 31 F.3d 794, 796 (9th

15  Cir. 1994).  Prison officials who deliberately deny an inmate access to a legitimate means to petition for

16  redress of grievances by hindering his litigation may violate the prisoner's constitutionally protected

17  right to access to the courts. *Lewis,* 518 U.S. at 351-355 (1996); *Vandelft* 31 F.3d at 796.  To state a

18  claim for denial of access to the courts, a plaintiff must allege a specific actual injury involving a non-

19  frivolous direct appeal, habeas corpus proceeding or section 1983 action.  *See Lewis*, 518 U.S. at 351-

20  52, 353 n.3, 353-5; *Madrid,* 190 F.3d at 995.

21         Here, Plaintiff has not presented any evidence that shows he was injured in any way by the

22  return of the law journal.  He did not allege any injury, such as an inability to file a complaint or defend

23  against a claim based on his lack of access to that law book.  *See Jones,* 393 F.3d at 936.  Accordingly,

24  this Court **RECOMMENDS** that Defendant's motion for summary judgment on the access to courts

25  claim be **GRANTED**.

26         **F.     Equal Protection Claim.**

27         The Court notes that Plaintiff says his due process rights were violated because he did not

28  receive the same equal protection as the penal inmates housed in the general population.  Warren Depo.

67:16-24.  He argues that the trustees have more rights and privileges than the civil detainees.  *Id.* at

67:25-68:8.  While civil detainees under the SVP statute are not members of a suspect class, they are

entitled to a "heightened scrutiny standard" when evaluating some of the fundamental rights such as

some of the ones at issue here.  *Hydrick*, 500 F.3d 978 at 998.  Defendant, however, never raised the

equal protection issue and does not move for summary judgment on it.  Accordingly, this Court

**RECOMMENDS** that Plaintiff be able to continue litigating his equal protection claim.

**V.    Freedom of Association**.

Plaintiff complains Defendant's policies violated his right to freedom of association because he

could only associate with other civil detainees at George Bailey.  In his deposition he explained that he

could not mingle in a large group like the criminal inmates could.

"A prison inmate retains those first amendment rights that are not inconsistent with his status as

a prisoner or with the legitimate penological objectives of the corrections system."  *Pell v. Procunier*,

417 U.S. 817, 822 (1974).  But a prisoner's right to associate is, by necessity, restricted and "may be

curtailed whenever the institution's officials, in the exercise of their informed discretion, reasonably

conclude that such associations . . . possess the likelihood of disruption of prison order or stability . . ."

*Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 132 (1977); *Franklin v. Murphy*,

745 F.2d 1221, 1230 (9th Cir. 1984).  Further, "freedom of association is among the rights least

compatible with incarceration. [Citations omitted.] Some curtailment of that freedom must be expected

in the prison context."  *Overton v. Bazzetta*, 539 U.S. 126, 131 (2003).

Plaintiff was lawfully detained under the SVP Act.  Defendant's policy to keep the criminal

inmates separate from the civil detainees is in Plaintiff's best interest because that policy prevents

violence and abuse by the criminal inmates towards the civil detainees.  Further, Plaintiff has

complained that he was sometimes in too close proximity to the criminal detainees, such as when he

rode the bus with them.  Based on what is before the Court, the gravamen of Plaintiff's claim here

appears to be that the population of civil detainees at George Bailey was not a large enough social group

for him.  He says that he could associate only with other civil detainees.  It is unclear who else Plaintiff

sought to associate with while detained at George Bailey.

The Court finds that there is no triable issue of material fact as to whether Plaintiff's right to

1   freedom of association was violated, and therefore **RECOMMENDS** that Defendant's motion for

2   summary judgment be **GRANTED** for this claim.

3   **VI.   Freedom of Religion.**

4          Plaintiff claims that while housed at the San Diego County Jail, no Catholic church service was

5   available to him.  He only attended a Bible study a few times with a volunteer, but then the volunteer

6   stopped coming.  He says there was only one religious service for him while at George Bailey, but that

7   Christian services were held out in the yard for the general population.  Such services were not available

8   to civil detainees because there were no volunteers to provide them.

9          The free exercise clause of the first amendment protects not only the right to hold a particular

10  religious belief, but also the right to engage in conduct motivated by that belief.  *Employment Div. v.*

11  *Smith*, 494 U.S. 872, 877 (1990).  Religious exercise typically refers to an act or practice mandated by

12  or central to a particular religion.  *Hernandez v. Commissioner*, 490 U.S. 680, 699 (1989) (religious

13  exercise defined as observation of central religious belief).  "The right to exercise religious practices and

14  belief does not terminate at the prison door."  *McElyea v. Babbit*, 833 F.2d 196, 197 (9th Cir. 1987).  A

15  prisoner, however, "is not entitled to have the clergyman of his choice provided for him in the prison."

16  *Reimers v. Oregon*, 863 F.2d 630, 632 (9th Cir. 1988).

17         To establish that his first amendment right to free exercise of religion has been violated, Plaintiff

18  must establish the religious practice at issue satisfies two criteria:  (1) the "proffered belief must be

19  sincerely held" and (2) the "claim must be rooted in religious belief, not in 'purely secular'

20  philosophical concerns."  *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994) (internal citations omitted).

21  He must show that Defendant "burdened the practice of his religion, by preventing him from engaging

22  in conduct which is mandated by his faith, without any justification reasonably related to legitimate

23  penological interests."  *Freeman v. Arpaio*, 125 F.3d 732, 736 (9th Cir. 1997) (footnote omitted); *Turner*

24  *v. Safely*, 482 U.S. 78, 89 (1987).  Thus, even if the religious claim merits first amendment protection,

25  the free exercise right is "necessarily limited by the fact of incarceration, and may be curtailed in order

26  to achieve legitimate correctional goals or to maintain prison security."  *McElyea*, 833 F.2d at 197.

27         Here, Plaintiff is Catholic.  He complains that there is no available weekly church service for

28  him to attend.  He proffers some evidence that he sincerely holds his religious belief and that he seeks to

1   practice by attending services every week.  He attended Catholic services every Sunday while at Mule

2   Creek State Prison.  He attends Catholic services every Sunday at Coalinga.  In complaining that no

3   services were available to him, Plaintiff argues that his religious belief was burdened because Sheriff

4   Kolender's policy prevented him from engaging in a practice–attending weekly services–required by his

5   belief in Catholicism.

6          Sheriff Kolender argues that to serve the legitimate correctional goal of maintaining prison

7   security–and in compliance with the law–his policy kept Plaintiff segregated from the general

8   population of inmates for religious services.  The motivation for this policy was controlling statutory

9   and case law as well as the legitimate interest of protecting Plaintiff from the criminal inmates.

10  Therefore, while Plaintiff could not attend the religious services available to the criminal inmates, he

11  could attend any religious services available to civil detainees.  Sheriff Kolender explains that the San

12  Diego County jails do not provide religious services to inmates, nor do they promote religion or the

13  attendance of religious services.  Brewer Decl. ¶ 11.  They do, however, allow volunteers from various

14  religious faiths to enter the jails and hold religious services.  *Id.*  Volunteers choose to hold these

15  services for the general population of inmates because there is a  greater number of participants that

16  come from the general population.  *Id.*  Because only a few number of civil detainees have expressed

17  interest in attending religious services, volunteers have told the jails that they do not have the time or

18  staff to provide services for only a few people. *Id.*  But if volunteers are willing, Defendant's policy

19  permits such volunteers to come for civil detainees.  *Id.*

20         The Court finds that Sheriff Kolender has not adequately explained the legitimate penological

21  interest in not providing the same access to religious services for Plaintiff that he provided for the

22  criminal inmates.  To balance the competing penological interests with Plaintiff's constitutional right,

23  the Court must consider these factors:  (1) there must be a "valid, rational connection between the prison

24  regulation and the legitimate governmental interest put forward to justify it;" (2) "whether there are

25  alternative means of exercising the right that remain open to prison inmates;" (3) "the impact

26  accommodation of the asserted constitutional right will have on guards and other inmates, and on the

27  allocation of prison resources generally;" and (4) "the absence of ready alternatives is evidence of the

28  reasonableness of a prison regulation."  *Turner v. Safley,* 482 U.S. 78, 89-91 (1987).

First, Defendant has not set forth a valid reason for the policy of using only volunteers to provide religious services.  For example, he has not provided any specific information as to how much actual effort he made to find volunteers to provide services to SVPs or why he only uses volunteers to provide religious services for the SVPs.  Defendant does not address whether–other than joining the general population for services–there was an alternative means for Plaintiff to exercise his right.  Neither does Defendant explain the impact that finding a priest or other person able to provide services would have on the guards and other inmates, such as having the time to locate a willing provider, the cost of looking for one, or the logistics for organizing the services.  While a legitimate penological interest may exist for Defendant to not have searched for and provided a person to provide religious services for Plaintiff here, he has not met his burden on summary judgment to show that he is entitled to prevail on this claim.

Accordingly, the Court finds there is a triable issue of material fact as to whether Plaintiff's right to free exercise of religion was violated, and therefore **RECOMMENDS** that Defendant's motion for summary judgment be **DENIED** for this claim.

### CONCLUSION

Based on the foregoing reasons, the Court hereby **RECOMMENDS** that Defendant's motion for summary judgment be:

1.   **DENIED** as to Sheriff Kolender's personal liability.

2.   **DENIED** as to Sheriff Kolender's professional capacity liability.

3.   **DENIED** as to Sheriff Kolender's respondeat superior liability.

4.   **DENIED** as to Sheriff Kolender's claim for qualified immunity.

5.   **DENIED** as to Sheriff Kolender's claim for quasi-judicial immunity.

6.   **DENIED** as to Plaintiff's fourth amendment claim.

7.   **DENIED** as to Plaintiff's fourteenth amendment claim for Defendant's failure to protect Plaintiff from criminal inmates.

8.   **DENIED** as to Plaintiff's fourteenth amendment claim for Defendant's use of excessive force.

9.   **DENIED** as to Plaintiff's fourteenth amendment claims regarding the 23-hour lockdowns and the 24-hour florescent lighting while in administrative segregation at the San Diego

26

County Central Jail.

10.   **GRANTED** as to Plaintiff's fourteenth amendment claims regarding the unsanitary conditions while at Medical 101.

11.   **GRANTED** as to Plaintiff's fourteenth amendment medical claim.

12.   **GRANTED** as to Plaintiff's first amendment right to freedom of association claim.

13.   **DENIED** as to Plaintiff's first amendment right to free exercise of religion claim.

This Court **FURTHER RECOMMENDS** that Plaintiff be able to continue litigating his fourteenth amendment equal protection claim.

The undersigned Magistrate Judge submits this report and recommendation pursuant to 28 U.S.C. § 636(b)(1) to the United States District Judge assigned to this case.

**IT IS ORDERED** that no later than ***June 6, 2008*** any party to this action may file written objections with the Court and serve a copy on all parties.  The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than ***June 16, 2008.*** The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order. *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED**.

DATED:  May 23, 2008

Nita L. Stormes
Hon. Nita L. Stormes
U.S. Magistrate Judge

05cv2095 LAB (NLS)