1
2
3
4
5
6
7
8                    **UNITED STATES DISTRICT COURT**
9                    **SOUTHERN DISTRICT OF CALIFORNIA**
10

11   ANDREW WARREN,                              CASE NO. 05CV2095-LAB (NLS)

12                              Plaintiff,        **ORDER SUSTAINING IN PART
                                                 AND OVERRULING IN PART
13            vs.                                 DEFENDANT'S OBJECTIONS TO
                                                 REPORT AND
14                                               RECOMMENDATION, AND
                                                 ADOPTING IN PART AND
15                                               REJECTING IN PART REPORT
                                                 AND RECOMMENDATION; AND
16   WILLIAM B. KOLENDER, Sheriff; CAPT.
     DENNIS RUNYEN, Chief, San Diego             **ORDER GRANTING DEFENDANT
17   County Detention Services; CAPT.            KOLENDER'S MOTION FOR
     CAMPBELL (CJ); LT. SCOTT (CJ); LT.          SUMMARY JUDGMENT**
18   ELIVEN (CJ); SGT. P. LACHAPPELL (CJ);
     SGT. LEWIS (CJ); SGT. GLOVER,
19   Classification; DEP. MCCRACKEN (CJ);
     CAPT. J. INGRASSIA (GBDF); LT. EVENS
20   (GBDF); SGT. BREWER (GBDF); SGT.
     COYNE (CGDF); CORP. DICKERSON
21   (GBDF); DEP. BARRERA (GBDF); DEP.
     SOBJAW (GBDF); DEP. BORDEN (GBDF);
22   LT. WILLIAM KEMERY (IAD); SAN
     DIEGO COUNTY BOARD OF
23   SUPERVISORS, JOHN/JANE DOES 20-50,

24                              Defendants.

25

26            On March 21, 2006, Plaintiff, proceeding *in forma pauperis*, filed his first amended complaint

27   ("FAC") seeking relief pursuant to 42 U.S.C. § 1983 for alleged violations of his Constitutional rights

28   while he was housed in the San Diego County jail.  Defendant Kolender, the only remaining Defendant

1   in this action, filed a motion for summary judgment (the "MSJ").  Pursuant to 28 U.S.C. § 636, the

2   motion for summary judgment was referred to Magistrate Judge Nita Stormes for report and

3   recommendation.  On May 28, 2008, Judge Stormes issued her report and recommendation (the

4   "R&R"), recommending granting in part and denying in part the MSJ. Defendant Kolender filed

5   objections to the R&R, but Plaintiff did not.

6       The Court previously screened Plaintiff's original complaint and FAC and issued two orders

7   explaining the deficiencies of those complaints on their face and *sua sponte* dismissing claims against

8   all Defendants except Sheriff Kolender and the San Diego County Board of Supervisors.  (Order of

9   January 27, 2006 and Order of May 30, 2006.)  Plaintiff was given an opportunity to amend, but

10  abandoned the dismissed claims.  The Board was later dismissed.  Rather than amending his complaint

11  as permitted to state a claim against the Board, Plaintiff attempted to appeal the order, then abandoned

12  his claims.  This left Sheriff Kolender as the sole remaining Defendant, and claims against him for

13  housing him under penal conditions of confinement as the only remaining claims.  (*See* Order of May

14  30, 2006 at 15:22–26.)  Although the FAC is lengthy — 50 pages, including a declaration and

15  Plaintiff's logs showing yard and dayroom time but not including exhibits — the allegations against

16  Defendant Kolender, and thus the remaining claims, are slim.

17  **I.     Legal Standards**

18      A district court has jurisdiction to review a Magistrate Judge's report and recommendation

19  concerning a dispositive pretrial motion. Fed. R. Civ. P. 72(b).  "The district judge to whom the case

20  is assigned shall make a de novo determination upon the record, or after additional evidence, of any

21  portion of the magistrate judge's disposition to which specific written objection has been made in

22  accordance with this rule." *Id.*; *see also*  28 U.S.C. § 636(b)(1)(C).  "A judge of the court may accept,

23  reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge."

24  28 U.S.C. § 636(b)(1)(C).  Thus, this Court must review those parts of the report and recommendation

25  to which a party has filed a written objection.  Moreover, 28 U.S.C. § 636(b)(1) does not require some

26  lesser review by the district court when no objections are filed. *Thomas v. Arn*, 474 U.S. 140, 149–50

27  (1985).  The Ninth Circuit has interpreted the language of 28 U.S.C. § 636(b)(1), and determined that

28  the "statute makes it clear that the district judge must review the magistrate judge's findings and

recommendations *de novo if objection is made*, but not otherwise." *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121 (9th Cir. 2003) (en banc).

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, demonstrate that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party shows that there is an absence of evidence to support the non-moving party's claims, the burden shifts to the non-moving party resisting the motion to "set forth specific facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 256 (1986). "A material issue of fact is one that affects the outcome of the litigation and requires a trial to resolve the parties' differing versions of the truth." *S.E.C. v. Seaboard Corp.*, 677 F.2d 1301, 1305–06 (9th Cir. 1982).

To successfully rebut a properly supported motion for summary judgment, the non-moving party "must point to some facts in the record that demonstrate a genuine issue of material fact and, with all reasonable inference made in the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]."  *Reese v. Jefferson Sch. Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citations omitted).

The Court construes Plaintiff's pleadings liberally.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988).  The Court is not, however, required to "comb the record to find some reason to deny a motion for summary judgment," even when the plaintiff is proceeding *pro se*. *Tran v. California*, 280 Fed. App. 653, 653 (9th Cir. 2008) (quoting *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001)) (affirming district court's grant of summary judgment against *pro se* plaintiff).  The Court may exercise its discretion to consider materials in the record not specifically referred to in the pleadings, in appropriate circumstances.  *Carmen*, 237 F.3d at 1031.

In deciding a motion for summary judgment, the Court considers the evidence in the light most favorable to the non-moving party.  *Porter v. Cal. Dep't of Corr.*, 383 F.3d 1018, 1024 (9th Cir. 2004). The Court does not make credibility determinations or weigh conflicting evidence; these determinations are for the trier of fact and inappropriate for summary adjudication proceedings. / / /

*Anderson*, 477 U.S. at 249.  The Court need not, however, accept legal conclusions cast in the form of factual allegations.  *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981).

Qualified immunity shields state officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (internal citations omitted).  "The relevant question . . . is the objective (albeit fact specific) question whether a reasonable officer could have believed [his or her actions] to be lawful, in light of clearly established law and the information" the official possessed. *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). Qualified immunity is "an immunity from suit rather than a mere defense of liability . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  Accordingly, the Supreme Court has "repeatedly . . . stressed the importance of resolving [qualified] immunity questions at the earliest possible stage in litigation." *Hunter v. Bryant*, 502 U.S. 224, 227 (1991).

The question of official immunity is subject to the same analysis as are factual disputes. *Butler v. San Diego Dist. Attorney's Office*, 370 F.3d 956, 964 (9th Cir. 2004).  Once Defendant has made a properly supported motion for summary judgment based on official immunity, Plaintiff is required to produce evidence in opposition.  *Id.*  In the absence of evidence, the Court may not assume the challenged factual allegations are true.  *Id.*

Although this order is primarily directed to ruling on the MSJ, the Court is under an independent obligation to dismiss claims to the extent they cannot support a recovery, as set forth in 28 U.S.C. § 1915(e)(2).

## II.      Discussion

### A.      Background

The following factual background is taken from the R&R's report of facts, to which neither party has objected and which the Court therefore adopts.  Plaintiff was convicted in 1999 of committing a lewd act upon a child under the age of fourteen and sentenced to eight years in prison. He pleaded guilty to a similar charge for conduct occurring in Rhode Island.  He was scheduled to be released from Mule Creek State Prison on February 21, 2005.  Plaintiff was, however, transferred to the San Diego County jail beginning January 4, 2005 where he was held during ongoing court

proceedings to determine whether he was a sexually violent predator ("SVP").  He was processed at San Diego County Central Jail, but immediately moved to George F. Bailey Detention Facility ("George Bailey") also in San Diego, where he was housed in protective custody and kept away from the general population of inmates from January 4 to January 23, 2005.  He was then held at San Diego County Central Jail from January 24, 2005 to May 24, 2005.  He was then moved to the medical unit at George Bailey where he was kept from May 25, 2005 until January 10, 2006.  On December 13, 2005, he was determined to be an SVP.   He was ultimately transferred to Coalinga State Hospital.

Plaintiff alleges he was held in the county jails under Defendant Kolender's supervision in what amounted to punitive conditions.  He alleges, among other things, he was strip searched around four times at George Bailey between January 4 and January 24, 2005 and again at the San Diego County Central Jail on January 24, 2005.  Defendant has presented evidence showing his policies do not permit female guards to conduct strip searches of male inmates, and every attempt is made to prevent a female guard from having to be present during the strip search of a male inmate.  Plaintiff also alleges Defendant failed to protect him from the abuse of other detainees and employees, permitted the use of excessive force and abuse by other detainees while Plaintiff was being transferred by bus, and failed to provide Constitutionally adequate conditions of detention.   The allegedly inadequate conditions of confinement included fewer amenities than prisoners enjoyed, and lights left on 24 hours a day.  Plaintiff also brings equal protection claims based on the same factual predicates.

Plaintiff has also brought free exercise claims, arguing he was not given adequate opportunity to practice his religion.  Plaintiff, who is Catholic, complains no church service or access to clergy was provided.  Defendant has presented evidence the jail relies on volunteers to provide religious services, and that Plaintiff was permitted to receive visits from clergy who wished to visit him.

Plaintiff has also brought other claims which the R&R recommends dismissing.

### B.      Analysis of Objections

The Court has, as required, conducted a *de novo* review of those portions of the R&R to which Defendant has specifically objected.  After review, the Court has determined that most of Defendant's objections should be sustained, resulting in the granting of summary judgment on all remaining claims. / / /

Furthermore, the Court rejections portions of the R&R because the analysis is overly solicitous toward Plaintiff's claims and inconsistent with the summary judgment standard set by the Ninth Circuit.

Although the Court liberally construes the pleadings of *pro se* litigants and plaintiffs bringing civil rights claims, *Karim-Panahi v. Los Angeles Police Dept.*, 839 F.2d 621, 623 (9th Cir.1988), especially in civil rights cases, *Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992), the Court may not "supply essential elements of claims that were not initially pled." *Ivey v. Bd. of Regents of the Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). Nor will the Court assume Plaintiff can prove facts he has not alleged, or that Defendant has violated laws in ways that have not been alleged. *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

In particular, Plaintiff has neither alleged nor provided evidence to connect Defendant Kolender with many of the violations, as is required to withstand summary judgment. Rather, many allegations appear directed at Defendants who have since been dismissed after Plaintiff abandoned his claims against them. In some cases, it is clear Defendant Kolender was not involved in the alleged violations. Furthermore, Plaintiff has failed to allege or provide evidence for certain other key elements of his claims. Plaintiff's *pro se* status does not relieve him of the responsibility to obey the same rules as other litigants, *King v. Atiyeh*, 814 F.2d 565, 567 (9th Cir. 1987), including Fed. R. Civ. P. 56 and associated requirements. *See Beard v. Banks*, 548 U.S. 521, 536 (2006) (granting summary judgment because plaintiff, a prisoner proceeding *pro se* and bringing civil rights claims, had failed to point to specific facts in the record that could lead a rational trier of fact to find in his favor) (citation omitted).

In addition, the R&R's solicitous approach to Plaintiff's claims conflicts with the Court's two screening orders. To cite one example, Plaintiff was twice specifically advised he could not bring claims on a *respondeat superior* theory. (*See, e.g.*, Order of January 27, 2006 at 6:16–28; Order of May 30, 2006 at 4:10–16.) Also, the Court also pointed out Plaintiff could not bring a claim for denial of access to courts unless he could show he was precluded from pursuing a non-frivolous direct or collateral attack on either his criminal conviction or sentence or the conditions of his current confinement, which he twice failed to do. (*See* Order of January 27, 2006 at 9:3–10:4; Order of May

30, 2006 at 5:15–26.)  The R&R, however, recommended denying summary judgment as to Plaintiff's claims that he was not permitted to make phone calls to his attorney.

### 1.    Objection: Defendant's Actions Were Constitutional at the Time

Defendant has objected that, at the time they were implemented, his policies were Constitutional under *Munoz v. Kolender*, 208 F. Supp. 2d 1125 (S.D.Cal. 2002), and it was only when *Jones v. Blanas*, 393 F.3d 918 (9th Cir. 2004), became final that he could have known they were unconstitutional.  This forms part of Defendant's argument he is entitled to qualified immunity.  He also points out that, while *Blanas* was issued December 27, 2004, it became final no earlier than March 4, 2005, when the mandate was issued, after which the policies at issue here were changed.  In a related argument, Defendant contends he should be afforded a reasonable period (he proposes 90 days) to make appropriate changes after a decision clearly establishing a right.

When presented with a defense of qualified immunity, the Court must determine whether, "[t]aken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right." *Clement v. Gomez*, 298 F.3d 898, 903 (9th Cir. 2002) (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  As discussed below, the Court holds, with regard to at least some claims, this requirement is met.  The Court must therefore also decide whether the violated right was "clearly established."  *Id.*  Under *Saucier*, the Court would have been required to make the determinations in this order; under *Pearson v. Callahan*, ___ S.Ct. ___, 2009 WL 128768 (Jan. 21, 2009), however, the Court may answer either question first.

While Defendant has cited authority in the separate sections raising objections with regard to particular claims (which will be discussed in the relevant sections below), the one authority he relies on in support of his general argument is *Munoz*, and he recognizes that after *Blanas*, Plaintiff's due process right as a civil detainee to be held in conditions no more restrictive than prisoners was clearly established.

A right may, however, be "clearly established" even before official action is declared unconstitutional; the only requirement is that the unlawfulness be "apparent in light of preexisting law." *Blueford v. Prunty*, 108 F.3d 251, 254 (9th Cir. 1997) (citing *Anderson v. Creighton*, 483 U.S. at 640).  When reasonable officials would know without further guidance from the courts that their

action was unconstitutional, closely analogous pre-existing case law is not required to show the law is clearly established. *Mendoza v. Block*, 27 F.3d 1357, 1361 (9th Cir. 1994) (quoting *Casteel v. Pieschek*, 3 F.3d 1050, 1053 (7th Cir. 1993)). The appropriate question is whether, in light of preexisting law, the unlawfulness of Defendant's actions was apparent. *Anderson v. Creighton*, 483 U.S. at 640. Contrary to Defendant's argument, a final, binding precedent is not required. Even if no opinion had yet been issued in *Blanas*, the Court would be required to consider the holdings of other courts, and to predict the likelihood the Ninth Circuit or the Supreme Court would adopt them. *Kirkpatrick v. City of Los Angeles*, 803 F.2d 485, 490 (9th Cir. 1986). In this case, the Court need not go through the motions of making such a prediction because Defendant had the benefit of the now-final decision in *Blanas*, which explained the Ninth Circuit's reasoning and showed its reliance on decisions predating Defendant's actions. *See All-Kidd v. Gonzales*, 2008 WL 553777 at n.6 (D.Idaho Feb. 13, 2008) (holding *Blanas* applicable to events occurring before *Blanas* was decided). The Court therefore finds the law was clearly established by the time Plaintiff was put into Defendant's custody.

This objection is therefore **OVERRULED**.

### 2.    Objection: Defendant Should Be Given 90 Days to Make Changes

Defendant objects that he should be given a 90-day period after *Blanas* became final in which to comply with its requirements. Defendant cites no precedent in support of this argument, and the Court has found none. In any event, Defendant has not shown the changes required under *Blanas* were not feasible by the time Plaintiff was transferred to his custody and the 90-day figure appears to be arbitrary. This objection is therefore **OVERRULED**.

### 3.    Objection: Defendant Is Entitled to Quasi-Judicial Immunity

Defendant argues that by housing Plaintiff in the county jail, he was following a facially valid court order and is therefore shielded by quasi-judicial immunity. In support of this, he cites *Munoz*, 208 F. Supp. 2d at 1153, *Roland v. Phillips*, 19 F.3d 552, 557 (11th Cir. 1994), and *Coverdell v. Dep't of Soc. & Health Servs.*, 834 F.3d 758, 764–65 (9th Cir. 1987).

Defendant, however, misconstrues *Munoz*. There, the Court held the defendant was immune from suit in his official capacity because his actions were the result of a court order and not the defendant's own policy or custom. The court orders in question directed the defendant to hold the

1  plaintiff in an unspecified "secure facility," which in that case was the county jail.  Here, Plaintiff's

2  claims arise not from his mere confinement in the county jail, but for conditions under which he was

3  held.

4       *Halbert v. Herbert*, 2008 WL 4460213, slip op. at *7–*9  (N.D.Cal., Sept. 30, 2008) illustrates

5  the distinction.  There, the court relied on *Blanas* and *Munoz* to conclude that civil detainees may

6  Constitutionally be held in the same jails in which criminal detainees or convicts are also housed.  *Id.*

7  at *7–*8.  The court separately considered other claims relating to conditions of confinement.  *Id.* at

8  *8–*9.

9       This objection is therefore **OVERRULED**.

10      **4.       Objection:  Plaintiff Was Still a Prisoner When the Strip Searches Were**

11      **Conducted**

12      The strip searches in question were conducted during January, 2005, when Defendant alleges

13  Plaintiff was still a prisoner and not yet a civil detainee.  The R&R concluded based on the FAC's

14  allegations regarding Plaintiff's status during the relevant time period that Plaintiff had produced

15  adequate evidence to withstand summary judgment.  The R&R further concluded that because

16  Plaintiff's status was relevant to his Fourth Amendment claim, summary judgment should be denied.

17  Defendant specifically objected to this conclusion.

18      Because Plaintiff is proceeding *pro se*, the Court "must consider as evidence in his opposition

19  to summary judgment all of [his] contentions offered in motions and pleadings, where such contentions

20  are based on personal knowledge and set forth facts that would be admissible in evidence, and where

21  [he has] attested under penalty of perjury that the contents of the motions or pleadings are true and

22  correct."  *Blanas*, 393 F.3d at 923.

23      The FAC, which is verified, alleges that on January 4, 2005, Plaintiff was transferred to the San

24  Diego County Central Jail to begin civil commitment proceedings.  He concludes "At that point —

25  Legally and Factually — plaintiff ceased being a prisoner and was a Civil Detainee for the purpose of

26  establishing his Legal Status."  (FAC at 4.4.)  He alleges that, as of that time, he was "technically on

27  parole from the Department of Corrections, having an earliest possible release date of February 21,

28  2005."  (*Id.*)  California's Sexually Violent Predators Act ("SVPA"), Welf. & Inst. Code, §§ 6600 *et*

*seq.*, sets forth the procedure for civil commitment of an individual as a sexually violent predator. While such a person may be held in custody after a probable cause hearing, §§ 6601.5, 6602, 6602.5(a), he may not be civilly committed until after he has been found to be a sexually violent predator at trial. § 6604.

The R&R relied on *Blanas* for the principle that a person awaiting involuntary commitment proceedings may not constitutionally be held in the same punitive conditions as are prisoners. (R&R at 8:14–17 (citing *Blanas*, 393 F.3d at 932).)   *Blanas*, however, dealt with a plaintiff who was transferred to a county jail shortly before his criminal sentence ended, but held for over two years while awaiting civil commitment.  393 F.3d at 923–24.  The plaintiff's claims arose from incidents after his criminal sentence had expired.  *Id.* at 922.

Having reviewed the pleadings in light of the applicable law, the Court finds the FAC's remarks regarding his status to be legal conclusions, rather than factual allegations.  When Plaintiff argues he "ceased being a prisoner" simply by virtue of his being transferred to the jail, he is drawing a legal conclusion about the effect of the SVPA on him.  His remark that he was "technically on parole from the Department of Corrections" cannot mean he had in fact already been paroled, because he specifies his earliest possible release date was February 21, 2005.  Although the R&R found no evidence showing when Plaintiff's criminal sentence expired, Defendant correctly cited the transcript of Plaintiff's deposition in which Plaintiff explained he was scheduled to be released from his criminal sentence on February 21, 2005.[1]  (Ex. 2 to MSJ (Warren Deposition), at 11:17–23.)  The FAC reasons that as of the date of his transfer, "pursuant to *Page v. Torrey*[,] 201 F.3d 1136 (9th Cir. 2001) plaintiff ceased being a prisoner for the purposes of the Prison Litigation Reform Act ("PLRA") and thus ceased being a prisoner for any other purpose."  (FAC at 5.18) (italics added).  Plaintiff is apparently relying on particular language in *Page* explaining that "although Page was a 'prisoner' within the meaning of the PLRA when he served time for his conviction, he ceased being a 'prisoner' when he was released from the custody of the Department of Corrections."  201 F.3d at 1140.  Plaintiff misreads *Page*, however; the opinion makes clear Page was no longer considered a prisoner because

---

[1] This date is roughly corroborated by accompanying testimony, in which Plaintiff explained he was arrested April 21, 1998, convicted in October, 1999, and sentenced to "eight years or 85 percent."  (*Id.* at 11:12–16.)  This would have resulted in a release date in February, 2005.

1   he had completed his sentence, and not merely because of where he was being detained. *See id.* at

2   1139 ("[T]he natural reading of the text is that, to fall within the definition of 'prisoner,' the individual

3   in question must be currently detained as a result of accusation, conviction, or sentence for a criminal

4   offense.")  Plaintiff's citation to *Page* makes clear, however, he is drawing a legal conclusion based

5   on his views of the law.  The remainder of Plaintiff's pleadings are in harmony with this interpretation.

6   (*See, e.g.*, Warren Decl. in Supp. of FAC, ¶ 4 (drawing legal conclusions regarding Plaintiff's status).)

7        While *Blanas* authorizes the Court to consider Plaintiff's verified complaint, the Court may

8   only do so to the extent the complaint contains evidence that would be admissible in evidence. *Blanas*,

9   393 F.3d at 923.  Legal conclusions such as Plaintiff has relied on here do not meet this standard. *See,*

10   *e.g., Brown v. Runnels*, 2008 WL 3833552, slip op. at *2, *13 (E.D.Cal., Aug. 13, 2008) (holding that

11   legal conclusions in *pro se* plaintiff's complaint were insufficient to satisfy the *Blanas* standard).

12        Because the only evidence shows Plaintiff was a prisoner rather than a civil detainee when the

13   searches were conducted, the Court examines them under the standard set forth in *Bell v. Wolfish*, 441

14   U.S. 520, 559–60 (1979), which upheld naked body cavity searches of inmates considered necessary

15   by prison officials to detect contraband, even without probable cause.  The Ninth Circuit has explained

16   that strip searches may or may not be constitutionally permissible, depending on a number of factors.

17   *Michenfelder v. Sumner*, 860 F.2d 328, 332 (9th Cir. 1988). Among these (in addition to several

18   factors laid out in *Bell*) are justification, scope, place, and manner. *See Thompson v. Souza*, 111 F.3d

19   694, 700–01 (9th Cir. 1997).  Here, Plaintiff challenges the justification, place, and manner of the

20   searches to which he was subjected.  He bears the burden of showing that Defendant used "exaggerated

21   or excessive means to enforce security." *Michenfelder*, 860 F.2d at 333.

22        Defendant points to substantial evidence showing occasional strip searches are necessary to

23   maintain security and, where possible, are conducted without guards of the opposite sex present.

24   (Def.'s Mem. of P. & A. in Supp. of Mot. for Summ. J. ("MSJ"), at 3:20–27 (citing Ex. 3 to MSJ

25   (Decl. of Sgt. Carl Brewer, ¶ 8).)  In particular, Defendant's detailed evidence shows both the weekly

26   searches and those conducted in connection with the transportation of prisoners were conducted in

27   response to known dangers, in order to protect both prisoners and staff.  (Brewer Decl., ¶ 8.)  Three

28   of the searches Plaintiff was subjected to appear to be what Sgt. Brewer refers to as weekly "hygiene

searches," intended to detect contraband as well as one search at George Bailey just before Plaintiff was transferred to the San Diego County Central Jail and another the same day just after he arrived at the San Diego County Central Jail.  In response, Plaintiff does not point to any evidence regarding the circumstances or purpose of the searches, except the declaration Defendant cites.  (Opp'n to MSJ at 12:23–14:20.)

The only evidence in support of Plaintiff's position is therefore the fact that two of them were conducted in the presence of female guards.  This by itself is insufficient to support Plaintiff's claim. *Michenfelder*, 860 F.2d at 334 (holding that the monitoring of male prisoners by female guards during strip searches does not violate the Fourth Amendment).  There is no evidence Defendant's policy required the use of "exaggerated or excessive means to enforce security." *Id*. at 333.  Furthermore, even assuming Plaintiff was unconstitutionally strip-searched in the presence of female guards, the only available evidence shows Defendant's policy discouraged this.  There is no showing Defendant caused any violation. *See Bacon v. Kolender*, 2007 WL 2669541, slip op. at *6 (S.D.Cal. Sept. 6, 2007).

The only evidence supports Defendant's contention that the searches were conducted for the purpose of maintaining jail security and managing the jail effectively, which are legitimate, non-punitive purposes. *Blanas*, 393 F.3d at 932 (citation omitted). The Court therefore **SUSTAINS** this objection.

### 5.        Objection: Defendant Provided Adequate Protection in Jail

The R&R recommended granting in part and denying in part Defendant's request to dismiss Plaintiff's Fourteenth Amendment claims for failure to protect him from other prisoners, and Defendant objected to these recommendations.  These claims focus on Defendant's policy of using colored armbands to identify different classes of prisoners or detainees, the effect of which Plaintiff argues was to identify him as an SVP.  As an SVP, Plaintiff maintains he was subject to attacks by other prisoners, and Defendant Kolender knew this.  Specifically, Plaintiff claims that he wore a yellow band, and (possibly at a different time) a black band.  He contends that after an argument with a civil detainee, a deputy announced over the public address system that all inmates with yellow bands

/ / /

1   were child molesters.  (Ex. 2 to MSJ (Depo. Tr. of Pl.) at 38–40.)  He makes similar allegations that

2   other deputies identified him and other civil detainees as sex offenders.  (*Id.* at 50–52.)

3       As a result, Plaintiff alleges, other prisoners kicked his cell door and "gassed" his cell with

4   urine[2] but apparently did not hit Plaintiff.  The prisoners believed to be responsible were moved to a

5   separate module.  When one prisoner resisted removal, guards pepper-sprayed him.  Plaintiff alleges

6   the spray went through the ventilation system and into Plaintiff's cell.

7       Defendant objects to the recommended finding that Defendant never explained why two

8   sheriff's deputies announced to inmates that Plaintiff was an SVP, and why inmates were required to

9   wear the identifying armbands.  Defendant points out the declaration of Carl Brewer, explaining the

10  policy of keeping civil detainees separate from prisoners.  (Brewer Decl., ¶¶ 4–11.)  He also points to

11  Exhibit CC attached to the FAC, a response to Plaintiff's grievance regarding the use of armbands,

12  which explains: "By having black bands, you are now identified as a classification to all so that at no

13  time will you be placed with other inmates."  As the Court previously held, the use of identifying

14  armbands to permit jail staff to distinguish prisoners from civil detainees is a legitimate and non-

15  punitive purpose.  (Order of May 30, 2006 at 14:10–18 (citing *Blanas*, 393 F.3d at 932).)

16      Defendant points out his policy is to discourage staff from informing inmates of information

17  about other inmates that could result in their being targeted.  (Mem. in Supp. of MSJ at 5:18–21,

18  7:4–7. (citing evidence).)  Furthermore, he points to evidence prisoners routinely knew the meaning

19  of the armbands even without such announcements.  (*Id.* at 5:21–23, 7:4–7.)  The Court finds no

20  evidence Defendant had anything to do with the deputies' announcements.  *Taylor v. List*, 880 F.2d

21  1040, 1045 (9th Cir. 1989) ("A supervisor is only liable for constitutional violations of his subordinates

22  if the supervisor participated in or directed the violations, or knew of the violations and failed to act

23  to prevent them.") (citation omitted).

24      Defendant correctly points out Plaintiff was never left unprotected nor was he harmed by

25  prisoners; rather, while prisoners kicked his door and gassed his cell with urine three times, Plaintiff

26  himself was never physically accosted.  After Plaintiff and others reported the gassings, the prisoners

27

28      [2] These gassings consisted of using a cleaning spray bottle to spray urine into Plaintiff's cell through a one-inch gap next to Plaintiff's solid, locked cell door.  There is no evidence Plaintiff was ever hit or in danger of being hit during the gassings or that he reasonably feared being attacked.

1   believed to be responsible were moved.  (Mem. in Supp. of MSJ at 5:2–10.)  These alleged wrongs

2   amount to harassment, but not actual harm.  Nor is there any evidence Plaintiff was ever at any serious

3   risk of harm from other inmates.  Other than the nuisance of having to clean up the urine, Plaintiff's

4   trouble sleeping (which he has alleged was also caused by many other factors), and general annoyance,

5   Plaintiff's accidental exposure to pepper spray was the only alleged harm.  Furthermore, the only

6   available evidence shows when the harassment became known to jail officials, they acted to protect

7   Plaintiff and other civil detainees.

8         The R&R concluded that a question of fact remained as to how long Plaintiff was exposed to

9   the "gassing" and how long Defendant Kolender took to respond to it.  (R&R at 16:5–8.)  These

10  questions were not, however, created by any evidence Plaintiff presented, but rather by gaps in

11  Defendant's evidence.  Plaintiff, not Defendant, bears the burden of producing evidence showing how

12  long he was exposed to gassing and how long Defendant took to respond to it.  His opposition to the

13  MSJ is, however, devoid of any such evidence, nor does it even address "gassing."  In finding a triable

14  issue of fact on this issue, the R&R erroneously shifted the burden of production from Plaintiff to

15  Defendant.

16        Plaintiff has no evidence any of this was deliberate, knowing, or intentional.  The discomfort

17  to which Plaintiff was exposed, even if the result of negligence, does not give rise to a Fourteenth

18  Amendment violation.  *Daniels v. Williams*, 474 U.S. 327, 328 (1986) ("[T]he Due Process Clause is

19  simply not implicated by a *negligent* act of an official causing unintended loss of or injury to life,

20  liberty, or property.")  *See also Hydrick v. Hunter*, 500 F.3d 978, 997 (9th Cir. 2007) (holding that

21  defendants could be liable for permitting harassment and abuse of civil detainees if the plaintiff could

22  prove defendants' "blindness to such conditions").

23        Because Plaintiff has no evidence to support his claims, and in some cases fails to state a claim

24  altogether, this objection is **SUSTAINED**.

25        **6.      Objection: Defendant Did Not Subject Plaintiff to Excessive Force**

26        Plaintiff brings excessive force claims, alleging he was unnecessarily kept for long periods of

27  time in shackles and handcuffs.  The R&R also construed the FAC as alleging he was transported on

28  buses or vans where prisoners could spit on him and other civil detainees.  In fact, the FAC contains

1   no such allegations.  Defendant objected to the R&R's recommendation that his motion for summary

2   judgment on these claims be denied.

3          The R&R noted Defendant made no effort to explain the reasons for holding Plaintiff in

4   shackles and handcuffs while being transported when Plaintiff was attending court proceedings, or

5   what efforts were made to temper the force used.  Unnecessarily restraining a detainee for long periods

6   of time even while he is in a holding cell may constitute excessive force.  *See Bell*, 441 U.S. at 539

7   n.20 (citing, as an example of unnecessarily harsh treatment, "loading a detainee with chains and

8   shackles and throwing him in a dungeon"); *Hanks v. Prachar*, 457 F.3d 774, 775 (8th Cir. 2006)

9   (holding that material issue of fact existed regarding whether legitimate government interest required

10  restraining a detainee for long periods while he was in his cell).  Plaintiff alleges he was shackled and

11  handcuffed only while being transported.  (FAC at 5.)  He also alleges he was kept in holding cells

12  with criminal inmates or chained to criminal inmates, although he does not allege he was ever harmed

13  by this, nor does he allege this occurred after February 21, 2005.  (*Id.* at 5–5.1.)

14         Physical restraint of detainees is of course necessary at times.  *Youngberg v. Romeo*, 457 U.S.

15  307, 320 and n.26 (1982).  Defendant points to the necessity of preventing Plaintiff from escaping, and

16  the impracticality of other methods of preventing escape.  (Obj. to R&R at 11:3–7, 11:15–23.)

17  Obviously, the danger of escape or fights between inmates is heightened when inmates are transported

18  in a group.  *See, e.g., Sundquist v. Philp*, 2008 WL 859452 slip op. at *13 (N.D.Cal. Mar. 28, 2008)

19  (pointing out inmates are shackled while transported by van in a group to prevent them from harming

20  each other or overpowering guards).  Defendant also emphasizes his responsibility for ensuring

21  Plaintiff was present at court.  (*Id.* at 11:19–21.)  Under *Blanas*, 393 F.3d at 932, these are legitimate,

22  non-punitive government interests.  Therefore, even assuming Plaintiff was handcuffed and shackled

23  while being transported after his criminal sentence expired, the Court holds Defendant has provided

24  evidence of a legitimate non-punitive reason for using handcuffs and shackles when transporting

25  Plaintiff as part of a group of inmates.  Plaintiff has provided no evidence the use of restraints was

26  punitive in nature.

27         The Court further notes that even if shackling and handcuffing Plaintiff for transportation, and

28  transporting him in the same bus with prisoners amounted to a Constitutional violation, the right to

1   be free from such a violation was not clearly established at the time. *Sundquist*, 2008 WL 859452 at

2   *15. Thus, Defendant would be entitled to qualified immunity.

3       The R&R noted that Plaintiff could not maintain a claim merely for being transported in the

4   same vehicle as prisoners, but recommended denying summary judgment because such arrangements

5   put Plaintiff close enough to prisoners that they could spit on him. While knowingly permitting

6   prisoners to spit on a civil detainee is a Constitutional violation, *Bacon*, 2007 WL 2669541, slip op.

7   at *12 (S.D.Cal., Sept. 6, 2007), merely placing a detainee near a prisoner is not. Although, as the

8   R&R points out, Plaintiff said at his deposition that groups he was in were spat on twice, he never

9   raised any such claim in the FAC nor is there any indication he intended to do so. The closest the FAC

10  comes is to allege Plaintiff should not have been transported in the same vehicles as prisoners because,

11  in Plaintiff's view, this violated state law. This by itself requires sustaining Defendant's objection.

12      Furthermore, the only available evidence shows while being transported by bus, he was

13  separated from prisoners by being secured inside a "cage" made of steel partitions with small holes

14  in them, and guards were posted next to the partitions. (Billick Decl., ¶ 7, 10). Plaintiff testified

15  prisoners were able to spit on the detainees "a couple of times" through the holes in the partition while

16  guards sat idly by without preventing them. (Depo. Tr. of Pl. at 53:1–9, 58:14–25, 59:1–13.) The

17  only evidence shows that when Defendant Kolender found out about the spitting, he ordered plexiglass

18  barriers installed to prevent it. (Billick Decl., ¶ 11.) This might support a claim against the unnamed

19  deputies, but it does not support a claim against Defendant.

20      Defendant's objection to this recommendation in the R&R is therefore **SUSTAINED**.

21          **7.      Objection: Plaintiff Was Lawfully Subjected to Lockdown and Nighttime**

22              **Lighting**

23              **a.      Conditions in Ad Seg**

24      Plaintiff was held in administrative segregation ("ad seg") at the San Diego County Central Jail

25  from approximately January 24, 2005 to May 24, 2005. (R&R at 3:13–15.) During this time,

26  prisoners and detainees held in ad seg had less time to use the dayroom and exercise yard, which is

27  also used by general population prisoners. Plaintiff complains that, as a civil detainee, he should not

28  have been held in ad seg with its attendant restrictions and hardships. The cells in ad seg were noisier

1  because of public announcements, television noise from the dayroom, and other factors.  Plaintiff

2  alleges he did not have telephone access to call his attorney, and his law library access was more

3  limited than prisoners'.

4         The R&R relied on *Blanas*, 393 F.3d at 934–935.  *Blanas*, however, did not hold that civil

5  detainees could not be held in ad seg, but rather that subjecting them to more restrictive conditions

6  while in segregated confinement had to be supported by legitimate reasons and the restrictions could

7  not be "'excessive in relation to' the purpose of keeping civil and criminal detainees separate . . . ."

8  393 F.3d at 934 (quoting *Demery v. Arpaio*, 378 F.3d 1020, 1028 (9th Cir. 2004)).

9         More seriously, the FAC does not clearly allege to what degree Defendant participated in any

10 deprivation of Plaintiff's rights.  Rather, Plaintiff's allegations make clear certain of Defendant's

11 subordinates made decisions regarding restrictions.  Apparently, the R&R construed all allegations as

12 against Defendant himself.  There is no evidence, however, that any of the inequities were imposed

13 by Defendant's policies; rather, Plaintiff attempted to show deputies' decisions caused the

14 deprivations.  (*See, e.g.*, FAC at 5.5–5.6 (alleging that on April 5 and 8, 2005, Sgt. Lewis permitted

15 him a total of only 2 hours 40 minutes outside his cell in the yard or dayroom, although the policy

16 required at least two hours daily); 5.7 (alleging that on March 16, 2005, Plaintiff complained to Sgt.

17 Glover that he had not been provided dayroom time for two days).)

18        The R&R itself takes note of evidence that these decisions were largely made on an *ad hoc*

19 basis by deputies and not by Defendant Kolender himself.  (R&R at 18:21–25 (quoting Elvin Decl. as

20 saying deputies "tried to give inmates as much time in the day room as possible . . . this was more

21 difficult for the civil detainees and SVPs in Administrative Segregation, because they could not be

22 present in the day room with other inmates."))  Attached to the FAC are Plaintiff's extensive logs and

23 schedules showing his dayroom and yard time and various other events.  (FAC, Exs. A, B, T, OO.)

24 These  show he often called his attorney and regularly received dayroom and yard time, although the

25 schedule was often interrupted and the time was not uniform.  For example, from January 25 to

26 February 27, 2005 he received around an hour daily of dayroom time and six calls or attempted calls

27 to his attorney.  (*Id.*, Ex. A.)  He also attaches numerous grievances regarding being denied full

28 dayroom or yard time on particular occasions, his complaints regarding the scheduling of dayroom

05CV2095

time, and his sometimes being denied an opportunity to call his attorney.  (*Id.*, Exs. B, D, E, F, H, I, J, N, Q, U, EE, KK.)  In all cases, he blames the deputies, not Defendant Kolender.

Defendant's briefing tries to explain and justify the deputies' decisions and excuse the neglect, but he has not admitted to participating in the decisions at the time.  The allegations cannot fairly be read to allege Defendant himself cut minutes out of Plaintiff's dayroom or yard time or deprive Plaintiff of any privilege or amenity, nor does Plaintiff provide any comparison between the privileges, amenities, and dayroom and yard time provided to him and those provided to prisoners.

Plaintiff has alleged, without providing much detail, that he was not always provided with cleaning materials on a regular basis to clean his cell with.  (Warren Decl. ¶ 17.)  The Complaint, however, makes clear he is accusing Deputy Barrera of failing or refusing to provide cleaning supplies "for retaliatory, arbitrary, and capricious reasons." (FAC at 5.16.)  There is no allegation or evidence Defendant Kolender was involved.

Defendant objects that California Penal Code § 4002(b) requires civil detainees being held pursuant to the SVPA must be held in administrative segregation.  This section also defines administrative segregation as "separate and secure housing that does not involve any deprivation of privileges other than what is necessary to protect the inmates and staff."  If Plaintiff were bringing claims against Sgts. Glover and Lewis or other jail officials who actually made decisions regarding restrictions, his claims might survive summary judgment.  The only claims against Defendant Kolender, however, are that his policies required that Plaintiff be held in ad seg.  Plaintiff has failed to make allegations, much less provide evidence, showing that Defendant Kolender had any direct involvement in any deprivation of his rights.

For these reasons Defendant's objections to this portion of the R&R are **SUSTAINED**.

### b.    Phone Calls to Attorney

Plaintiff's opportunity to communicate with his attorney is not properly described as a privilege for purposes of comparing his treatment with that of prisoners.  Rather, this is a right to the extent they are necessary to provide Plaintiff with Constitutionally-mandated access to courts.  *Lewis v. Casey*, 518 U.S. 343, 349–51 (1996). There is, however, no "free-standing right to a law library or legal assistance," *id.* at 355, nor is there a clearly established right for a detainee to speak to his attorney by

1   phone as much as he wishes and at times of his own choosing. *Valdez v. Rosenbaum*, 302 F.3d 1039,

2   1048 (9th Cir. 2002) (noting prisoner had various means of communicating with his attorney); *Hydrick*,

3   500 F.3d at 999–1000 (holding that civil detainees must be given a reasonable opportunity to employ

4   and consult with counsel, subject to legitimate restrictions).

5          While Plaintiff has alleged he could not call his attorney, it is apparent what he means is that

6   his ability to call his attorney was sometimes interrupted or curtailed so that he could not always call

7   when he wished. As noted, the exhibits to the FAC show he called his attorney multiple times. There

8   is no showing he was generally limited from calling, nor does he show his opportunities to call were

9   inadequate for some other reason. His pleadings have not shown or attempted to show that any

10  limitations infringed his right of access to courts or prejudiced him in any way. Furthermore, the

11  pleadings make clear when he was denied an opportunity to call, it was the decision of a deputy, not

12  Defendant Kolender.

13              **c.    Nighttime Lighting**

14         Plaintiff has also argued his Eighth Amendment rights were violated because a night light was

15  left on all night in his cell, interfering with his sleep. He says this caused grogginess and difficulty

16  concentrating. The only cells in the jail where lights were not left on were cells housing trustees, who

17  are not considered escape risks. For obvious reasons, officials' ongoing need to be able to see into

18  cells where sexually violent predator detainees are housed is a legitimate penological concern.

19         The Court has previously addressed a similar claim recently, in its order granting the

20  defendant's motion for summary judgment in *Walker v. Woodford*, ___ F. Supp. 2d ___, 2008 WL

21  5486770 (S.D.Cal., Aug. 28, 2008). There, a prisoner complained that a 7-watt fluorescent "night

22  light" left on 24 hours a day prevented him from getting adequate sleep. The plaintiff, however,

23  presented no evidence showing the light and not something else (such as noise, anxiety, distraction,

24  or a medical condition) was the cause of his insomnia. Nor did he present evidence of the amount of

25  light actually shining on him.[3] Here, Plaintiff has said nothing about the brightness of the special night

26

27         [3] There, the plaintiff merely referred to the wattage of the bulb, which is not itself a measure
    of the brightness nor does it show how bright the cell was. Here, Plaintiff has not alleged how bright
28  the light was. Only after the Court directed the parties to address the issue were measurements
    conducted, and unrebutted evidence showed the light Plaintiff perceived as bright when he was vainly

light, although Defendant provided a transcript of Plaintiff's testimony that the bulb was short and yellow, not fluorescent, and in his opinion as bright as the light bulbs in the room where his deposition was held.  (Warren Depo. at 43:23–44:10.)

Plaintiff testified at his deposition that other factors such as inmates kicking his door and anxiety about harassment were causing him to lose sleep.  (Warren Depo. at 42:5–21, 46:3–10.)  He also said the noise of inmates watching television in the dayroom at night also caused sleeplessness. (Warren Decl., ¶ 17.)  Plaintiff covered his eyes, which he said permitted him to try to go to sleep, although sometimes the shirt he used fell off.  (*Id.* at 45:22–46:2.)  Furthermore, the FAC is replete with claims against several deputies for depriving Plaintiff of sleep by regularly tapping his bunk to rouse him, loudly bringing in supplies, frequently slamming or banging on doors, and requiring him to leave his cell in the middle of the night.   No evidence other than his own personal conclusion that the lighting was the cause of sleep problems is presented.  Plaintiff's own belief regarding the cause of his sleep problems is not, however, admissible as evidence.  Nor is his own annoyance at or fixation on the light adequate evidence.  *Walker*, 2008 WL 5486770, slip op. at *7.

As *Walker* explains, Plaintiff must present evidence of causation; that is, he must point to evidence from which a reasonable jury could conclude the light caused his sleeplessness.  This is particularly important where, as here, the evidence shows Plaintiff's sleep problems could have been caused by any of a number of factors. 2008 WL 5486770, slip op. at *7 (citing *Railway Labor Executives Ass'n. v. Dole*, 760 F.2d 1021, 1021 (9th Cir. 1985); *In re Paxil Litigation*, 218 F.R.D. 242 249 (C.D.Cal. 2003)).

In *Keenan v. Hall*, 83 F.3d 1083, 1090–91 (9th Cir. 1996), the Ninth Circuit held "[t]here is no legitimate penological justification for requiring [inmates] to suffer physical and psychological harm by living in constant illumination. This practice is unconstitutional." (quoting *LeMaire v. Maass*, 745 F. Supp. 623, 636 (D.Or. 1990), vacated on other grounds, 12 F.3d 1444, 1458–59 (9th Cir. 1993)).  But *Keenan* does not stand for the proposition that all 24-hour illumination in institutions is unconstitutional, and it has not been interpreted this way.  *Walker*, 208 WL 5486770, slip op. at *10.

---

trying to sleep was in fact about as bright as an evening sky just after sunset. ___ F. Supp. 2d ___, 2008 WL 5486770, slip op. at *5–*6.

1   (citing *Sisneroz v. Whitman*, 2008 WL 1734585, slip op. at *4 (E.D.Cal., April 11, 2008); *DuBois v.*

2   *McDonald*, 2007 WL 1659113, slip op. at *5 (D.Mont. June 5, 2007)).  With no proof that the light

3   was excessively bright, and no evidence showing the light rather than one or more of the many other

4   alleged distractions caused his sleep problems, this claim cannot withstand summary judgment.

5          For these reasons, Defendant's objections to this portion of the R&R are **SUSTAINED**.

6                      **8.      Objection: Defendant Was Not Required to Bring in Clergy**

7          Plaintiff, who is Roman Catholic, has alleged he was not provided the same access to religious

8   services as were prisoners.  Plaintiff testified at his deposition the religious accommodation he

9   received in the jail was limited.  Only one religious service of any kind was held while he was there.

10  (Warren Depo. at 66:8–15.)  He attended a Bible study led by a volunteer but after he attended a few

11  times, the volunteer did not return.  (*Id.* at 71:22–72:5.)  He did not attend Christian services held in

12  the yard.  (*Id.* at 72:6–11.)  He has no further evidence to support this claim.

13         Defendant has presented evidence the San Diego County jail provides no religious services to

14  any inmates, but permits volunteers from various religious faiths to come and hold services.  (Brewer

15  Decl., ¶ 11.)  Because of security concerns, a service can be open only to prisoners or to detainees, but

16  not both.  (*Id.*)  Volunteers conduct services for prisoners but because of the small number of detainees

17  have been unwilling to conduct services for detainees, although Defendant has asked them to do so.

18  (*Id.*)   Detainees, including Plaintiff, are permitted to arrange for clergy of their faith to visit them.

19  (*Id.*)

20         Prisoners are not entitled to have the clergyman of their choice provided for them in

21  correctional facilities.  *Reimers v. Oregon*, 863 F.2d 630, 631–32 (9th Cir. 1988) (citations omitted).

22  Civil detainees likewise have no such clearly established rights.  Nor does the Constitution require that

23  all prisoners be provided exactly the same religious facilities or personnel.  *Allen v. Toombs*, 827 F.2d

24  563, 569 (9th Cir. 1987).  In spite of Defendant Kolender's invitations, volunteers themselves decided

25  to provide more religious services to prisoners than to detainees.  There is no evidence Plaintiff asked

26  a local priest or any other clergy to visit him, although he could have done so.  *See id.* (permitting

27  outside religious leaders to enter penitentiary's segregation unit provided inmates an adequate

28  opportunity to exercise their faith).  Plaintiff did participate in some religious services while in the jail.

1  While he was dissatisfied with the services he received, he has not shown they were inadequate or that

2  he was prevented from practicing his faith.

3          Defendant's objection is therefore **SUSTAINED**.

4          **9.      Objection: Defendant Is Not Liable In His Official Capacity**

5          Defendant Kolender can be liable in his official capacity only to the extent his policies were

6  the "moving force behind the constitutional violation." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir.

7  1992) (quoting *City of Canton v. Harris*, 489 U.S. 378, 389–91 (1989). As discussed above, Plaintiff

8  has failed to make allegations or provide evidence showing that Defendant Kolender's policies were

9  the "moving force" of any violation of his Constitutional rights. The fact that Defendant Kolender put

10 in place policies for running the jail and dealing with inmates does not by itself suffice to establish his

11 liability for any violation that may have occurred on his watch. Taking Plaintiff's allegations and

12 evidence at face value, any violations of Plaintiff's rights were the result of other officers' decisions

13 and actions and not Defendant Kolender's policies.

14         To the extent Plaintiff may have intended to raise any further claims based on Defendant

15 Kolender's policies, the Court finds Plaintiff has not provided adequate allegations or evidence to

16 withstand summary judgment.   This objection is therefore **SUSTAINED**.

17 **III.   Conclusion and Order**

18         For reasons set forth above, the Court **REJECTS IN PART** and **ADOPTS IN PART** the

19 R&R. Defendant's MSJ is **GRANTED**. Because all other Defendants have been dismissed and all

20 claims against Defendant Kolender have been dismissed, this action is hereby **DISMISSED** and all

21 pending motions are **DENIED AS MOOT**.

22         **IT IS SO ORDERED**.

23 DATED:  January 21, 2009

24                                          *Larry A. Burns*

25                                          **HONORABLE LARRY ALAN BURNS**
                                           United States District Judge

26

27

28